**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CASSIA ENRIGHT , A MINOR and | : | |
| DONALD ENRIGHT AND SANDRA | : | |
| ENRIGHT, AS PARENTS AND | : | |
| GUARDIAN OF CASSIA ENRIGHT and | | |
| DONALD AND SANDRA ENRIGHT IN | | |
| THEIR OWN RIGHT | | |
| | | |
| v. | : | |
| | : | CIVIL ACTION |
| SPRINGFIELD SCHOOL DISTRICT | : | |
| and | : | NO. 04-cv-1653 |
| DR. JOSEPH O'BRIEN, | | |
| SUPERINTENDENT | | **JURY TRIAL DEMANDED** |
| SPRINGFIELD SCHOOL DISTRICT | : | |

**PRE-TRIAL MEMORANDUM**
**OF THE PLAINTIFFS**

For a pre-trial memorandum, plaintiff submits the following:

I.     SUMMARY OF THE CASE

In this matter, Cassia Enright, a minor, by and through her parents Donald and Sandra

Enright and Donald and Sandra Enright, in their own behalf, assert claims for damages against the

named defendants arising from the breach of their duty to protect Cassia from a sexually

offensive harassment-assault, which occurred while Cassia was in the custody and control of

employees of Springfield School District. The action is brought pursuant to the Individuals with

Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400. et. seq., Section 504 of the Rehabilitation

Act of 1973, (The Rehabilitation Act"),  29 U.S.C. Section 794,  the Americans with Disabilities

Act, 42 U.S.C. Section 12101, et. seq., the First and  Fourteenth Amendments to the United

States Constitution, and 42 U.S.C. Section 1983.

II.     SUMMARY OF THE FACTS

     a.      INTRODUCTION

Cassia Enright, is a minor, date of birth , October 5. 1994. Cassia resides with her parents

and guardians Donald and Sandra Enright at 302 Powell Road, Springfield, PA 19064. From entry

into the,Springfield Pennsylvania School District, Springfield PA Cassia has a special needs

student. Since 2000 to the present she has been placed at the Woodlynde School. The Springfield

School District is a governmental entity which pursuant to State law and with receipt of a

substantial amount of Federal funds, provides educational services to school aged children

residing in Springfield, Delaware County, Pennsylvania.

     b.      LACK OF POLICIES FOR TRAINING BUS DRIVERS REGARDING
            SPECIAL EDUCATION STUDENTS

Springfield School District  does not as a policy or practice require the Director of

Transportation to determine whether the age mix or the psychological conditions of the special

education students support this transportation mix.

Springfield School District does not as a policy or practice provide any training to its bus

drivers regarding the protection of or the special needs related to transporting special education

students.

     c.      DIAGNOSIS AND EDUCATIONAL PLACEMENT OF CASSIA
            ENRIGHT

Cassia was diagnosed with Attention Deficient/Hyperactivity Disorder ("ADD"),

2

combined type, and Asperger's Disorder by Dr. Bertram Ruttenberg in November, 1988.  Cassia has been in continuous treatment, as needed for Aspergers and ADD, from that date to the present. Cassia attended the Elwyn Developmental Preschool in Media, Pennsylvania in 1999. In September, 2000, Cassia began kindergarten at the Woodlyde School in Stafford, PA. Woodlyde is a specialized educational facility for students with these disorders. Cassia's diagnosis and attendance at Woodlyde were known to and approved by the Springfield School District.

In 2000, by way of a Settlement Agreement, Springfield School District Agreed to place Cassia in Woodlynde and to provide her transportation to and from that school.. That transportation was in a school van, with a 7 year old young special education male student.

d       2001 CHANGE IN TRANSPORTATION

In or around November, 2001, Patricia Schultz, Springfield School District's then Assistant Manager of Transportation  advised Mr. and Ms. Enright, by telephone, that the defendant School District was unilaterally changing Cassia's transportation, from transportation with the 7 year old special education child, to include several teen aged males.  Mr. and Mrs. Enright were not given any written notice of this change in transportation.

Springfield School District does not as a policy or practice provide parents of special education children written or oral notice that the transportation mix of students was being changed. Springfield School District does not as a policy or practice provide parents of special education children written or oral notice information as to the other students who are added to a transportation mix or any information as to the psychological problems, if any related to those additions.

When Ms. Enright expressed concern over the addition of the teenagers, Ms. Schultz told Mr. and Ms. Enright that the transportation change was non-negotiable, and that they had no alternative but "to take it". Accordingly, the defendant school district did not provide the Enrights with oral or written notice that they had a right to contest this unilateral chance in the transportation arrangement.

The Enrights were not aware that they had any due process right to appeal or seek review of this unilateral change in the transportation arrangement.  To the contrary, Mrs. Enright was told that she "had no choice" in the matter.  Ms. Shultz also told Ms. Enright that the School District would provide appropriate supervision. The only discussion of Cassia's transportation was in the 2000 Settlement Agreement.

The School District specifically knew that the parents of a minor male student, who was of a similar age to Cassia, objected to the placement. This minor male student was set to ride the bus three days per week.. The School District agreed to supply this male student with an aide during the three days he rode this bus. The School District did not notify the Enrights of this aide arrangement,  and did not offer the Enrights the same or similar aide arrangement.

The "new transportation" began in or around late November, 2001. The Enrights were not provided specific information as to the known behavioral problems of the older adolescents that would be riding the bus with Cassia.

One of the newly added adolescent teens,"J.W.", was in attendance at the Devereaux School because of severe behavioral problems. J.W's behavioral problems included,  but were not limited to, depression, inability to relate to other students, severe acting out, manipulation,

4

refusal to follow authority and public displays of aggression.

Richard Barnswell, the bus driver for the new transportation mix was a person who had transported Cassia before and was familiar with her special needs. Mr. Barnswell took steps to keep Cassia physically separated from the older teen-agers.. Mr. Barnswell was familiar with JW. He had a prior experience where JW had aggressive harassed a Jewish female student, calling her a "Jew" and mocking the female in a loud and menacing tone. Mr. Barnwell was required to caution J.W. about this conduct.

In or around early, 2002, Mr. Barnswell suffered an accident and was replaced by a female bus driver, Patricia Cambell.  Several weeks after she began to drive bus 21  J.W. , violently  acted out towards Ms. Campbell, telling her to "f**** herself."

On April 22, 2002, Philip DiNardo, was the substitute bus driver for Ms. Schultz on bus 21. Mr. DiNardo was not provided any information regarding, Cassia, JW and TP the students who were being transported on bus 21 that day. Mr. DiNardo was not advised of Mr.Barnswell and Ms. Schultz's practice of separating Cassia from the older boys and/or having her sit directly behind the male bus driver.

e.     THE APRIL 22, 2002 INCIDENT

In the late afternoon of April 22, 2002, Cassia Enright, a then seven year old female special education student was on a Springfield Township School Bus, being transported home from Woodlynde School. The only other riders on the bus that afternoon were two teenagers, TP (aged 16) and JW (aged 17). Cassia was a victim of a sexual assault by both TP and JW.

The incident was extremely traumatic and involved offensive sexual conduct, sexual

harassment, assaults and threats of future harm.. Cassia testified that:

(1) Both TP and JW (the two teenage males) were cursing on the School Bus and she asked them to stop, but they declined

(2) Thereafter TP and JW forced her to watch an offensive simulation of a sexual incident;

(2). TP, one of the teenage males, grabbed her umbrella;

(3 TP rubbed the umbrella against his genital area, simulating masturbation

(4) TP made growling noises and faces while he engaged in this simulation

(5) TP exposed his penis to Cassia

(6) TP and JW told her to "lick and suck" TP's exposed penis

(7) When Cassia turned away from JW and TP and went into a fetal position on her bus seat -- JW grabbed her hair and pulled her head toward TP's groin and/or exposed penis.

(8) Both TP and JW told her not to tell, as "no one would believe you" .

(9) TP and/or JW threatened to kill Cassia's brother Timothy if she told anyone of the incident.

(5) JW encouraged the incident, participated in the threats and committed an assault and battery on Cassia by pulling her hair.

     f.    REPORTING OF ASSAULT AND CRIMINAL COMPLAINT
            INVESTIGATION

At or about 4:00 PM on April 22, 2002, Sandra Enright became concerned that Cassia was upset over some incident which has happened on the school bus because Cassia did not to be

alone with her father, Donald Enright . She telephoned Ms. Schultz, who reported the telephone call to her supervisor, Gus DiAmbrosio.

Cassia was severely traumatized by the incident. Immediately after the incident she was observed to have increased anxiety and agitation, intrusive thoughts related to the incident, avoidance of the events, a distrust of men and other related trauma. Cassia was placed on medication and given intensive therapy for the found conditions. From early May, 2002 to the present, Cassia has been in continual therapy for the psychological trauma related to the incident.

Mrs. Enright filed a criminal complaint with the Springfield police and ultimately spoke with a rape advocacy organization where Cassia was interviewed by a counsellor, to whom Cassia related facts which caused  the counsellor to conclude that Cassia was a victim of a sexual assault. On April 25, 2002, Jennifer DiPaolo, Esquire advised Defendant O'Brien in writing, of the incident and the trauma to Cassia.

A criminal investigation was commenced. In that interview Cassia advised the police that TP had exposed himself to her on the bus. J.W. and T.P. were found by the Police to have committed offensive conduct, were required to perform community service and acknowledged in writing that they acted "inappropriately" towards Cassia on  April 22, 2002.

g.    POST INCIDENT FIRST AMENDMENT ACTIVITY AND SCHOOL
        DISTRICT RETALIATION

On or about April 22, 2002, the defendants were placed on notice that Cassia was sexually assaulted  on the school bus. Superintendent O'Brien immediately assumed that the School District was going to be sued by the Enrights, "closed the wagons" and brought in the

lawyers.  Specifically, Superintendent O'Brien testified in his deposition that upon notice that

the police were involved and particularly after receipt of the April, 2002 letter from Jennifer

DiPillo, Esquire, he concluded that "this was quickly becoming a case of litigation".

Superintendent O'Brien testified that "we were cautioned that this could become a lawsuit."  As

such the School District feared a lawsuit and therefore went into "brought in the lawyers".

Thereafter all communication was through the District lawyers. (Id. at 54).   The District also

notified its Insurance Carrier.

This notice was information of an important public nature -- related to the safety of

Cassia and all school aged children under the care and control of the defendants and was a

predicate to the Enrights seeking redress in the courts. From date to the present, Ms. Enright has

continued to correspond in writing to the School District, Superintendent O'Brien and Donald

Cadge, President of the Board of Education, regarding the School District's violations of Cassia

State and Federal Rights.

Instead of responding with support, the defendants engaged in a campaign of harassment

and retaliation directed to Cassia and her parents.  This retaliation included:

1)      The School District not immediately offering Cassia an alternate safe

transportation plan;

2)      The School District delaying the production of the School Bus video tape.;

3)      The School District not immediate scheduling to be negotiated IEP for Cassia ;

4)      The School District unilaterally and arbitrarily removing the suggested safety plan

items from the post April, 2002 IEP. ;

5)      The School District balking at creating a safety situation for Cassia to return to the school bus, despite the recommendation of Cassia medical team. ;

6)      Co-Director of Special Education, Basil Bly acting offensively and inappropriately the Enrights at IEP meetings and Bail Bly's response to an Enright request that"to re-evaluate Cassia after the incident "would be a waste of taxpayer money". .;

7)      When apprised that Ms DiPillo's funding would end on May 31, 2003, a statement that any IEP meetings would be set after that date.

8)      The rejection of the IEP prepared by Woodlynde School and then offering a document under "sign it or leave it" situation.

9)      When at a meeting, Ms. Enright explained that Cassia was emotionally fragile and needed support, a School District representation with Co-Director of Special Education Roy Thompson in attendance, stating -- "if she dies, it is on you, not them".

10)     The District's failure to immediately provide an aide to Cassia.

11)     The District's refusal and failure to provide services to Timothy, the Enrights son.

The defendants were not similarly hostile to the Enrights prior to receiving notice of the April 22, 2002 incident. Id. If so, then this campaign was based in whole or in part on an interest of the defendants to deflect and responsibility for their actions, which proximately caused the April 22, 2002 incident.

h.      EXPERT OPINION OF DAVID ROSTETTER

David Rostetter, Ph.D. will testify that the conduct of the Defendants was violative of law and practice. (See Report, Attachment A ).

9

III.    STATEMENT OF THE LEGAL ISSUES

The legal issues in this case have been fully briefed in the Plaintiff's Motion and

Memorandum in Opposition to the Defendants Motion for Summary Judgment and are

incorporated by reference herein. Plaintiff requests leave to submit a trial memorandum and

instructions setting out the law prior to trial.

IV.    DAMAGES

1.    Plaintiffs will seek a damages award for past and future medical expenses for

treatment of Cassia and the family by Dr. Naser and Ms. Silverstein from April, 2002 to the

present and for the future proximately caused by the events in this litigation.  Proof will show

that these expenses exceed $10,000 for past expenses and many thousands for future expenses.

2.    Plaintiffs will seek compensatory damages from all defendants for the emotional

distress and trauma proximately related to the legal claims. The amount of this compensation is

subject to the sound discretion of the jury.

3.    Plaintiffs will seek exemplary damages from all individual defendants for the

emotional distress and trauma proximately related to the legal claims. The amount of this

compensation is subject to the sound discretion of the jury.

4.    Plaintiffs will seek an award of attorney fees and costs as permitted by law.

5.    Plaintiffs will seeking declaratory and injunctive relief assuring Cassia is not

subject to discrimination, is afforded all rights permitted by the Education Law, has her disability

properly accommodated and that Cassia and her family are free from retaliation.

V.    WITNESSES

A.    LIABILITY WITNESSES

1.    Donald Enright, 302 Powell Road, Springfield PA 19004, will testify as to liability and

damages issues -- the event before and after the April 22, 2002, incident and damages --the effect

of the April, 2002 incident and the retaliation on Cassia and himself and the Enright family.

2.    Sandra Enright, 302 Powell Road, Springfield PA 19004 will testify as to liability and

damages issues -- the event before and after the April 22, 2002, incident and damages --the effect

of the April, 2002 incident and the retaliation on Cassia and herself and the Enright family..

3.    Cassia Enright, 302 Powell Road, Springfield PA 19004 will testify as to liability and

damages issues -- the event before and after the April 22, 2002, incident and damages --the effect

of the April, 2002 incident and the retaliation on Cassia and herself and the Enright family..

4.    Timothy Enright, 302 Powell Road, Springfield PA 19004 will testify as to liability and

damages issues -- the event before and after the April 22, 2002, incident and damages --the effect

of the April, 2002 incident and the retaliation on Cassia and himself and the Enright family.

5.    Karen O'Brien,  5 Hetzel Road, Ridley Park, PA 19078 will testify as to liability and

damages-- the event before and after the April 22, 2002, incident and damages --the effect of the

April, 2002 incident and the retaliation on Cassia and the Enright family.

6.    Sharon Chaney, 144 South Norwinden Drive, Springfield PA 19064, will testify as to

liability and damages-- the event before and after the April 22, 2002, incident and damages --the

effect of the April, 2002 incident and the retaliation on Cassia and the Enright family.

7.    Jennifer DiPillo, Esquire, 204 South Avenue, Media Pa, 19063, will testify as to liability

issues -- the event before and after the April 22, 2002, incident and damages --the effect of the

April, 2002 incident and the retaliation on Cassia and the Enright family.

8.      Kristen l/n/u, WOR, 204 South Avenue, Media Pa, 19063, will testify as to liability issues -- the event before and after the April 22, 2002, incident and damages --the effect of the April, 2002 incident and the retaliation on Cassia and the Enright family.

9.      Jeffrey Naser, M.D. Main Line Clinical, 121 Wayne Avenue, Suite 300, Wayne PA 19087, will testify on liability and damages as a treating physician -- his diagnosis and prognosis, the special needs of children with Cassia's diagnosis, the psychiatric treatment given to Cassia, the relationship of the treatment to the incident and his recommendations.

10.     Laura Silverstien, Ms.W, Main Line Clinical, 121 Wayne Avenue, Suite 300, Wayne PA 19087, will testify on liability and damages as a treating therapist -- the diagnosis and prognosis, the special needs of children with Cassia's diagnosis; the psychiatric treatment given to Cassia, the relationship of the treatment to the incident and his recommendations.

11.     Penny Moldofsky, Principal Woodlynde Lower School, 445 North Gulph Road, Strafford PA 19087-5488, will testify on liability and damages, as the educational program needs for Cassia, the observed consequences of the April 2002 incident and interaction with the School District.

12.     Ms. Cassidy, Class room teacher, Woodlynde Lower School, 445 North Gulph Road, Strafford PA 19087-5488, will testify on liability and damages, as the educational program needs for Cassia, the observed consequences of the April 2002 incident and interaction with the School District.

13.     David Rosetter, Education Policy Solutions, LTD.,147 Marcum Lane,Harpers Ferry WV

25425 will be qualified as an expert and will testify on liability and damages as more specifically detailed in his expert report.

14.     Detective Mark Cottom, Springfield Police Department, 50 Powell Road, Springfield Pa 19064, will testify on liability as to his investigation of the Enright Complaint, including but not limited to the interviews of Cassia, TP and JW and the result of the Enright criminal complaint.

15.     Patrolman Dennis McPartland 50 Powell Road, Springfield Pa 19064, will testify  on liability as to his investigation of the Enright Complaint.

16.     Joseph O'Brien,  Principal, Springfield School District, 111 West Lamy Avenue, Springfield Pa, 19064 may be called as of cross examination and will testify on liability and damages as the absence of policies and practices in the Springfield School District to protect Cassia; the knowledge of Cassia' disability the placement of Cassia, the transportation change of Cassia; the April 2002 incident, the investigation of the April 2002 incident, the First Amendment Activity of the Enrights and other factual issues related to this case.

17.     Basil Bly, Special Education Director, Springfield School District, 111 West Lamy Avenue, Springfield Pa, 19064 may be called as of cross examination and will testify on liability and damages as the absence of policies and practices in the Springfield School District to protect Cassia; the knowledge of Cassia' disability; the placement of Cassia, the transportation change of Cassia; the April 2002 incident, the investigation of the April 2002 incident, the First Amendment Activity of the Enrights, the knowledge of the emotional problems of JW and other factual issues related to this case.

18.     Roy Thompson, Special Education Director, Springfield School District,  111 West Lamy

Avenue, Springfield Pa, 19064 may be called as of cross examination and will testify on liability

and damages as the absence of policies and practices in the Springfield School District to protect

Cassia; the knowledge of Cassia' disability; the placement of Cassia, the transportation change of

Cassia; the April 2002 incident, the investigation of the April 2002 incident, the First

Amendment Activity of the Enrights, the knowledge of the emotional problems of JW and other

factual issues related to this case.

19.     Patricia Schultz, Transportation Director, Springfield School District, 111 West Lamy

Avenue, Springfield Pa, 19064 may be called as of cross examination and will testify on liability

and damages as the absence of policies and practices in the Springfield School District to protect

Cassia; the knowledge of Cassia' disability; the placement of Cassia, the transportation change of

Cassia; the April 2002 incident, the investigation of the April 2002 incident, the First

Amendment Activity of the Enrights, the knowledge of the emotional problems of JW and other

factual issues related to this case.

20.     Justin DiAmbrosia, 2205 Clover Road, Broomal PA, Former Transportation Director,

Springfield School District, may be called as of cross examination and will testify on liability and

damages as the absence of policies and practices in the Springfield School District to protect

Cassia; the knowledge of Cassia' disability; the placement of Cassia, the transportation change of

Cassia; the April 2002 incident, the investigation of the April 2002 incident, the First

Amendment Activity of the Enrights, the knowledge of the emotional problems of JW and other

factual issues related to this case.

21.     Donald Cadge, President Springfield School District, Board, 111 West Lamy Avenue,

14

Springfield Pa, 19064 may be called as of cross examination and will testify on liability and damages as the absence of policies and practices in the Springfield School District to protect Cassia; the knowledge of Cassia' disability; the placement of Cassia, the transportation change of Cassia; the April 2002 incident, the investigation of the April 2002 incident, the First Amendment Activity of the Enrights, the knowledge of the emotional problems of JW and other factual issues related to this case.

22.     Pat Campbell, Bus Driver, Springfield School District, 111 West Lamy Avenue, Springfield Pa, 19064 may be called as of cross examination and will testify on liability and damages as the absence of policies and practices in the Springfield School District to protect Cassia; the knowledge of Cassia' disability; the placement of Cassia, the transportation change of Cassia; the April 2002 incident, the investigation of the April 2002 incident.

23.     Richard Barnswell , Bus Driver, Springfield School District, 111 West Lamy Avenue, Springfield Pa, 19064 may be called as of cross examination and will testify on liability and damages as the absence of policies and practices in the Springfield School District to protect Cassia; the knowledge of Cassia' disability; the placement of Cassia, the transportation change of Cassia; the April 2002 incident, the investigation of the April 2002 incident.

24.     Harry Sheldrake, Bus Driver, Springfield School District, 111 West Lamy Avenue, Springfield Pa, 19064 may be called as of cross examination and will testify on liability and damages as the absence of policies and practices in the Springfield School District to protect Cassia; the knowledge of Cassia' disability; the placement of Cassia, the transportation change of Cassia; the April 2002 incident, the investigation of the April 2002 incident.

25.      Phillip DiNardo, Bus Driver, Springfield School District, 111 West Lamy Avenue, Springfield Pa, 19064 may be called as of cross examination and will testify on liability and damages as the absence of policies and practices in the Springfield School District to protect Cassia; the knowledge of Cassia' disability; the placement of Cassia, the transportation change of Cassia; the April 2002 incident, the investigation of the April 2002 incident.

26.      Beverly Friel, employee, Springfield School District, 111 West Lamy Avenue, Springfield Pa, 19064 may be called as of cross examination and will testify on liability and damages as the absence of policies and practices in the Springfield School District to protect Cassia; the knowledge of Cassia' disability; the placement of Cassia, the transportation change of Cassia; the April 2002 incident, the investigation of the April 2002 incident.

27.      Rose Sikley, employee, Springfield School District, 111 West Lamy Avenue, Springfield Pa, 19064 may be called as of cross examination and will testify on liability and damages as the absence of policies and practices in the Springfield School District to protect Cassia; the knowledge of Cassia' disability; the placement of Cassia, the transportation change of Cassia; the April 2002 incident, the investigation of the April 2002 incident.

28.      J.W. additional defendant, c/o counsel for additional defendant, JW, may be called as of cross examination on liability and damages and will testify on his conduct before, during and after the April, 2002 incident, his disabilities, his psychiatric and psychological diagnosis and school conduct and the resolution  of the Enright criminal complaint.

29.      TP. additional defendant c/o counsel for additional defendant TP, may be called as of cross examination  on liability and damages and will testify on his conduct before, during and

after the April, 2002 incident, his disabilities, his psychiatric and psychological diagnosis and
school conduct and the resolution  of the Enright criminal complaint.

30.      Barbara Domingos, Ph.D, 30 South Valley Road, Suite 201 Paoli PA 19301, will be
testify on liability and damages as to her evaluations of Cassia and the diagnosis, prognosis, the
limitations found and conclusions set forth in her evaluations.

31.     Melanie Bruss, OTR/l and/or Record Custodian, Sea Shore House, will testify as the
Cassia's early evaluations.

32.     Irene Czuchan, Barbara Gordy McCrendy, Kimberly Porter, Amy Betts and/or Records
Custodian, Delaware County Early Intervention Unit, Ridely Community Center, 901 Morton
Avenue, Folsom PA 19023, will testify as the Cassia's early (pre-Springfield School District)
evaluations.

 33.     David M. Pollack, Dr. Richard Kaplan and/or Records Custodian, Delaware County
Kid's First, 2000 Sproul Rd, Broomall, PA 19008, will testify as to Cassia medical records and
her evaluations.

34.     Margarita Meehan, M.D., The Children's Hospital of Philadelphia. Division of
Neurology, 481 John Young Way, Exton PA 19341 and/or Records Custodian The Children's
Hospital of Philadelphia, 34th and Civic Center Blvd. Philadelphia PA 19104 will testify on
liability and damages as to Cassia evaluations, diagnosis and prognosis.

35.     Bernard Ruttenberg,  M.D. address to be supplied,  will testify on liability and damages as
to Cassia's initial evaluations, diagnosis and prognosis.

36.     J.B. Disheimer, Esquire, Two Penn Center, Suite 1705, Philadelphia PA, will testify on

liability,

37.     Mark A. Serini, Esquire, Front and Plum Streets, Media PA 19063 will testify on

liability.

38.     Andy Tyler, or custodian of records at Network Adjusters, 300 Walnut Street,

Philadelphia PA 19106, will testify on liability regarding the notice of claim filed by Springfield

School District in 2002-03 regarding the  April , 2002 incident.

39.     Custodian of Records, Devereux National, 44 Devereux Drive,P.O. Box 638

Villanova, PA 19085  and 600 Boot Road, Downingtown PA 19335, will testify on liability as

to JW' Devereux Records.

40.     Shanna Gratton, Devereux School, 44 Devereux Drive,P.O. Box 638

Villanova, PA 19085  and 600 Boot Road, Downingtown PA 19335, will testify on liability as

to JW Devereux evaluation(s).

41.     Amy Brost Ph.D. Devereux School, 44 Devereux Drive,P.O. Box 638

Villanova, PA 19085  and 600 Boot Road, Downingtown PA 19335, will testify on liability as

to JW Devereux evaluation(s).

42.     Inge Donstra, M.D. c/o Devereux School, 44 Devereux Drive,P.O. Box 638

Villanova, PA 19085  and 600 Boot Road, Downingtown PA 19335, will testify on liability as

to JW Devereux evaluation(s).

43.     David Gobel, M.A., 1489 Baltimore Pike, Building 200, Suite 250, Springfield PA 19064,

will testify on liability and damages as to his evaluation of Cassia

44.     Records Custodian of the Pennsylvania Commission on Crime and Delinquency, P.O.

Box 1167 Harrisburg, PA 17108-1167, will testify as to liability and the award to the Enright family regarding the April 2002 incident.

45.     Dr. Nicholas Ignatuk, Jr., Ridley School District, 901 Morton Avenue Folsom PA 19033 and/or Records Custodian, Ridley School District will testify as the school records for TP.

B.     DAMAGES WITNESSES

1.     Donald Enright, 302 Powell Road, Springfield PA 19004, will testify as to liability and damages issues -- the event before and after the April 22, 2002, incident and damages --the effect of the April, 2002 incident and the retaliation on Cassia and himself and the Enright family.

2.     Sandra Enright, 302 Powell Road, Springfield PA 19004 will testify as to liability and damages issues -- the event before and after the April 22, 2002, incident and damages --the effect of the April, 2002 incident and the retaliation on Cassia and herself and the Enright family..

3.     Cassia Enright, 302 Powell Road, Springfield PA 19004 will testify as to liability and damages issues -- the event before and after the April 22, 2002, incident and damages --the effect of the April, 2002 incident and the retaliation on Cassia and herself and the Enright family..

4.     Timothy Enright, 302 Powell Road, Springfield PA 19004 will testify as to liability and damages issues -- the event before and after the April 22, 2002, incident and damages --the effect of the April, 2002 incident and the retaliation on Cassia and himself and the Enright family.

5.     Karen O'Brien,  5 Hetzel Road, Ridley Park, PA 19078 will testify as to liability and damages-- the event before and after the April 22, 2002, incident and damages --the effect of the April, 2002 incident and the retaliation on Cassia and the Enright family.

6.      Sharon Chaney, 144 South Norwinden Drive, Springfield PA 19064, will testify as to liability and damages-- the event before and after the April 22, 2002, incident and damages --the effect of the April, 2002 incident and the retaliation on Cassia and the Enright family.

7.      Jennifer DiPillo, Esquire, 204 South Avenue, Media Pa, 19063, will testify as to liability issues -- the event before and after the April 22, 2002, incident and damages --the effect of the April, 2002 incident and the retaliation on Cassia and the Enright family.

8.      Kristen, WOR, 204 South Avenue, Media Pa, 19063, will testify as to liability issues -- the event before and after the April 22, 2002, incident and damages --the effect of the April, 2002 incident and the retaliation on Cassia and the Enright family.

9.      Jeffrey Naser, M.D. Main Line Clinical, 121 Wayne Avenue, Suite 300, Wayne PA 19087, will testify on liability and damages as a treating physician -- his diagnosis and prognosis, the special needs of children with Cassia's diagnosis, the psychiatric treatment given to Cassia, the relationship of the treatment to the incident and his recommendations.

10.     Laura Silverstien, Ms.W, Main Line Clinical, 121 Wayne Avenue, Suite 300, Wayne PA 19087, will testify on liability and damages as a treating therapist -- the diagnosis and prognosis, the special needs of children with Cassia's diagnosis; the psychiatric treatment given to Cassia, the relationship of the treatment to the incident and his recommendations.

11.     Penny Moldofsky, Principal Woodlynde Lower School, 445 North Gulph Road, Strafford PA 19087-5488, will testify on liability and damages, as the educational program needs for Cassia, the observed consequences of the April 2002 incident and interaction with the School District.

12.     David Rosetter, Education Policy Solutions, LTD.,147 Marcum Lane,Harpers Ferry WV

25425 will be qualified as an expert and will testify on liability and damages as more specifically

detailed in his expert report.

13.     Joseph O'Brien,  Principal, Springfield School District, 111 West Lamy Avenue,

Springfield Pa, 19064 may be called as of cross examination and will testify on liability and

damages as the absence of policies and practices in the Springfield School District to protect

Cassia; the knowledge of Cassia' disability the placement of Cassia, the transportation change of

Cassia; the April 2002 incident, the investigation of the April 2002 incident, the First

Amendment Activity of the Enrights and other factual issues related to this case.

14.     Basil Bly, Special Education Director, Springfield School District, 111 West Lamy

Avenue, Springfield Pa, 19064 may be called as of cross examination and will testify on liability

and damages as the absence of policies and practices in the Springfield School District to protect

Cassia; the knowledge of Cassia' disability; the placement of Cassia, the transportation change of

Cassia; the April 2002 incident, the investigation of the April 2002 incident, the First

Amendment Activity of the Enrights, the knowledge of the emotional problems of JW and other

factual issues related to this case.

15.     Roy Thompson, Special Education Director, Springfield School District,  111 West Lamy

Avenue, Springfield Pa, 19064 may be called as of cross examination and will testify on liability

and damages as the absence of policies and practices in the Springfield School District to protect

Cassia; the knowledge of Cassia' disability; the placement of Cassia, the transportation change of

Cassia; the April 2002 incident, the investigation of the April 2002 incident, the First

Amendment Activity of the Enrights, the knowledge of the emotional problems of JW and other factual issues related to this case.

16.     Patricia Schultz, Transportation Director, Springfield School District, 111 West Lamy Avenue, Springfield Pa, 19064 may be called as of cross examination and will testify on liability and damages as the absence of policies and practices in the Springfield School District to protect Cassia; the knowledge of Cassia' disability; the placement of Cassia, the transportation change of Cassia; the April 2002 incident, the investigation of the April 2002 incident, the First Amendment Activity of the Enrights, the knowledge of the emotional problems of JW and other factual issues related to this case.

17.     Justin DiAmbrosia, 2205 Clover Road, Broomal PA, Former Transportation Director, Springfield School District, may be called as of cross examination and will testify on liability and damages as the absence of policies and practices in the Springfield School District to protect Cassia; the knowledge of Cassia' disability; the placement of Cassia, the transportation change of Cassia; the April 2002 incident, the investigation of the April 2002 incident, the First Amendment Activity of the Enrights, the knowledge of the emotional problems of JW and other factual issues related to this case.

18.     Donald Cadge, President Springfield School District, Board, 111 West Lamy Avenue, Springfield Pa, 19064 may be called as of cross examination and will testify on liability and damages as the absence of policies and practices in the Springfield School District to protect Cassia; the knowledge of Cassia' disability; the placement of Cassia, the transportation change of Cassia; the April 2002 incident, the investigation of the April 2002 incident, the First

Amendment Activity of the Enrights, the knowledge of the emotional problems of JW and other factual issues related to this case.

19.     Pat Campbell, Bus Driver, Springfield School District, 111 West Lamy Avenue, Springfield Pa, 19064 may be called as of cross examination and will testify on liability and damages as the absence of policies and practices in the Springfield School District to protect Cassia; the knowledge of Cassia' disability; the placement of Cassia, the transportation change of Cassia; the April 2002 incident, the investigation of the April 2002 incident.

20.     Richard Barnswell , Bus Driver, Springfield School District, 111 West Lamy Avenue, Springfield Pa, 19064 may be called as of cross examination and will testify on liability and damages as the absence of policies and practices in the Springfield School District to protect Cassia; the knowledge of Cassia' disability; the placement of Cassia, the transportation change of Cassia; the April 2002 incident, the investigation of the April 2002 incident.

21.     Harry Sheldrake, Bus Driver, Springfield School District, 111 West Lamy Avenue, Springfield Pa, 19064 may be called as of cross examination and will testify on liability and damages as the absence of policies and practices in the Springfield School District to protect Cassia; the knowledge of Cassia' disability; the placement of Cassia, the transportation change of Cassia; the April 2002 incident, the investigation of the April 2002 incident.

22.     Phillip DiNardo, Bus Driver, Springfield School District, 111 West Lamy Avenue, Springfield Pa, 19064 may be called as of cross examination and will testify on liability and damages as the absence of policies and practices in the Springfield School District to protect Cassia; the knowledge of Cassia' disability; the placement of Cassia, the transportation change of

Cassia; the April 2002 incident, the investigation of the April 2002 incident.

23.     Beverly Friel, employee, Springfield School District, 111 West Lamy Avenue, Springfield

Pa, 19064 may be called as of cross examination and will testify on liability and damages as the

absence of policies and practices in the Springfield School District to protect Cassia; the

knowledge of Cassia' disability; the placement of Cassia, the transportation change of Cassia; the

April 2002 incident, the investigation of the April 2002 incident.

24.     Rose Sikley, employee, Springfield School District, 111 West Lamy Avenue, Springfield

Pa, 19064 may be called as of cross examination and will testify on liability and damages as the

absence of policies and practices in the Springfield School District to protect Cassia; the

knowledge of Cassia' disability; the placement of Cassia, the transportation change of Cassia; the

April 2002 incident, the investigation of the April 2002 incident.

25.     J.W. additional defendant, c/o counsel for additional defendant, JW, may be called as of

cross examination on liability and damages and will testify on his conduct before, during and after

the April, 2002 incident, his disabilities, his psychiatric and psychological diagnosis and school

conduct and the resolution  of the Enright criminal complaint.

26.     TP. additional defendant c/o counsel for additional defendant TP, may be called as of

cross examination  on liability and damages and will testify on his conduct before, during and

after the April, 2002 incident, his disabilities, his psychiatric and psychological diagnosis and

school conduct and the resolution  of the Enright criminal complaint.

27.      Barbara Domingos, Ph.D, 30 South Valley Road, Suite 201 Paoli PA 19301, will be

testify on liability and damages as to her evaluations of Cassia and the diagnosis, prognosis, the

limitations found and conclusions set forth in her evaluations.

28.     Melanie Bruss, OTR/l and/or Record Custodian, Sea Shore House, will testify as the

Cassia's early evaluations.

29.     Irene Czuchan, Barbara Gordy McCrendy, Kimberly Porter, Amy Betts and/or Records

Custodian, Delaware County Early Intervention Unit, Ridely Community Center, 901 Morton

Avenue, Folsom PA 19023, will testify as the Cassia's early (pre-Springfield School District)

evaluations.

30.     David M. Pollack, Dr. Richard Kaplan and/or Records Custodian, Delaware County

Kid's First, 2000  Rd, Broomall, PA 19008, will testify as to Cassia medical records and her

evaluations.

31.     Margarita Meehan, M.D., The Children's Hospital of Philadelphia. Division of

Neurology, 481 John Young Way, Exton PA 19341 and/or Records Custodian The Children's

Hospital of Philadelphia, 34th and Civic Center Blvd. Philadelphia PA 19104 will testify on

liability and damages as to Cassia evaluations, diagnosis and prognosis.

32.     Bernard Ruttenberg,  M.D. address to be supplied,  will testify on liability and damages as

to Cassia's initial evaluations, diagnosis and prognosis.

33.     Custodian of Records, Devereux National, 44 Devereux Drive,P.O. Box 638

Villanova, PA 19085  and 600 Boot Road, Downingtown PA 19335, will testify on liability as

to JW' Devereux Records.

34.     Shanna Gratton, Devereux School, 44 Devereux Drive,P.O. Box 638

Villanova, PA 19085  and 600 Boot Road, Downingtown PA 19335, will testify on liability as

PLAINTIFFS PROPOSED EXHIBIT SCHEDULE

to JW Devereux evaluation(s).

35.     Amy Brost Ph.D. Devereux School, 44 Devereux Drive,P.O. Box 638

Villanova, PA 19085  and 600 Boot Road, Downingtown PA 19335, will testify on liability as

to JW Devereux evaluation(s).

36.     Inge Donstra, M.D. c/o Devereux School, 44 Devereux Drive,P.O. Box 638

Villanova, PA 19085  and 600 Boot Road, Downingtown PA 19335, will testify on liability as

to JW Devereux evaluation(s).

37.     David Gobel, M.A., 1489 Baltimore Pike, Building 200, Suite 250, Springfield PA 19064,

will testify on liability and damages as to his evaluation of Cassia.

        Plaintiffs reserve the right to supplement this list and to use any witness identified by

any defendant.

VI.     EXHIBITS

| PLAINTIFF EXHIBIT | Date | SUMMARY OF DOCUMENT | Method Produced or BATES NO. |
|---|---|---|---|
| 1. | 4-22-02 | Investigative Report Springfield Police Department - re: CE criminal complaint | Plaintiff Production 000-05 |
| 2. | 8-20-02 | Transcript of C.E. interview with Springfield Police | Produced |
| 3. | 8-20-02 | Audio Tape-Statement of C.E | Produced |
| 4. | 02-present | CE Clinical Notes-Main Line Clinical Associates | Plaintiff Production 06-074 |
| 5. | 1999 | Domingos Neuropsychiatric Evaluation | Plaintiff Production 0075-0085 |

PLAINTIFFS PROPOSED EXHIBIT SCHEDULE

| | | | |
|---|---|---|---|
| 6. | | Children's Sea Shore House Record C.E. Delaware Cty Early Intervention Program | Plaintiff Production 086-122 |
| 7. | 1999-2003 | Derveroux School Records- J.W. | Plaintiff Production 123-152 |
| 8. | 3-2-00 | CER- JW | Plaintiff Production |
| 9. | 5-29/6-5-01 | Psychiatric Evaluation JW | Plaintiff Production |
| 10. | 2-26-03 | CER- JW | Plaintiff Production |
| 11. | | Ridley School District Records T.P. | Plaintiff Production 163-273 |
| 12. | | Woodlynde School Records T.P. | Produced |
| 13. | | Woodlynde School Records C.E. | Produced |
| | | | |
| 14. | | Vitae David Rostetter | Produced |
| 15. | February 8 2005 | Initial Expert Report - prior to Depositions | Produced 2-08-05 |
| 16. | July, 2005 | Supplemental Expert Report commenting on Discovery | Produced July, 2005 |
| 17. | | Training Material for Bus Drivers | School District Production |
| 18. | 2-8-00 5-23-00 | IEP C.E. Settlement Agreement C.E. | School District Production  # # 1053, 1402 |
| 19. | 3-05-02 | Domingos Evaluation of C.E. | Plaintiff/School District Production |
| 20. | 3-11-02 | Enright Letter to Bly re: Evaluation | Plaintiff Production at Defendant Deps |
| 21. | 4-8-02 | Notes Meeting re: C.E. | Defendants # 335 |
| 22. | 4-17-02 | Request to Participate in IEP | Plaintiff's Ex. at Deposition |

PLAINTIFFS PROPOSED EXHIBIT SCHEDULE

| 23. | 4-22-02 | Police complaint Springfield School District | Plaintiff production |
|---|---|---|---|
| 24. | 4-22-00 | Video Tape-Bus | Defendant production |
| 25. | 4-25-00 | DiPillo to O'Brien letter | Produced at O'Brien Deposition |
| 26. | 4-25-00 | Schultz to Bly report re: Bus Driver statement | Produced at Schultz deposition, Defendants # 1419 |
| 27. | 4-29-00 | DiPillo to Bly letter re: Incident | Produced at Defendants Depo. |
| 28. | 4-30-02 | Notes Woodlynde meeting | Defendant # 332 |
| 29. | 4-30-02 | IEP C.E. | Defendant # 142 |
| 30. | 5-08-02 | DiPillo letter to Bly | Defendant # 761 |
| 31. | 5-14-02 | Enright Letter to Bly | Defendant #545 |
| 32. | 5-16-02 | T.P. statement to Police | Springfield Police Records |
| 33. | 5-17-02 | DiPillo letter to O'Brien/Bly | Defendants #752 |
| 34. | 5-17-02 | Enright to Bly letter | Defendants #542 |
| 35. | 5-17-02 | Report of Main Line Clinical Associates re:C.E. | Defendants #754 |
| 36. | 5-20-02 | J.W. statement to Springfield Police | Plaintiff's Production/JW Deposition |
| 37. | 5-22-02 | Bly to Enright letter | Defendants #551 |
| 38. | 5-22-02 | Enright to Bly Letter | Defendants #555 |
| 39. | 5-28-02 | DiPillo to O'Brien letter | Defendants #746 |
| 40. | 6-7-02 | C.E. IEP | Defendants #93 |
| 41. | 6-8-02 | Settlement meeting re: Transportation | Defendants #320 |
| 42. | 6-08-02 | Enrights letter to O'Brien re: Bly | Defendants #499 |

PLAINTIFFS PROPOSED EXHIBIT SCHEDULE

| 43. | 6-12-02 | DiPillo to SSTK letter | Defendants #321 |
|---|---|---|---|
| 44. | 6-16-02 | T.P. letter to Detective Cottom re: Youth Panel | Plaintiff's Production |
| 45. | 6-17-02 | SSTK letter DiPillo letter re: IEP | Defendants Production |
| 46. | 6-25-02 | Settlement meeting | Defendants #320 |
| 47. | 8-02 | J.W. statement to Enrights | Plaintiff Production |
| 48. | 8-20-02 | C.E. transcript of statement to Police/Audio Tape of Statement | |
| 49. | 8-23-02 | Enright to OBrien letter | Defendants # 463 |
| 50. | 8-30-02 | T.P. statement to Enrights | Plaintiff Production |
| 51. | 9/-02 | Schultz e-mails | Defendants #240-44 |
| 52. | 9-9-02 | Settlement and Release C.E. | Defendants #585 |
| 53. | 10-7-02 | Enright to Schultz re: Transportation | Defendants # 312 |
| 54. | 10-17-02 | Crime Commisson Award Letter | Plaintiff Production |
| 55. | 10- 17/23-02 | Weber notice letter to O'Brien Sereni, Esq letter to Weber | .Defendants #432 # 436 |
| 56. | 11-08-02 | JW IEP | Plaintiff Production # 154-162 /JW Dep |
| 57. | 1-08-03 | Network Adjuster letter to O'Brien | Defendants # 428 |
| 58. | 1-08-03 | Network Adjuster letter to O'Brien | Defendants # 423 |
| 59. | 4-16-03 | Enright to Bly letter | Defendants #537 |
| 60. | 4-28-03 | Report Naser M.D. re: CE | Plaintiff Production |
| 61. | 4-28-03 | Enright letter to O'Brien | Defendants #  284, 419, O"Brien Dep. Ex. #6 |
| 62. | Spring,03 | Transportation Plan C.E. | Defendants #667 |
| 63. | 5-12-03 | Enright letter to Bly and O'Brien | Defendants  #415 |

PLAINTIFFS PROPOSED EXHIBIT SCHEDULE

| 64. | 5-12-03 | IEP | Defendants # 066 |
| 65. | 5-15-03 | Enright letter to Cadge (Chairman-Board) | Defendants # 536 |
| 66. | 5-27-03 | Cadge Letter to Enright | Defendants # 409 |
| 67. | 6-9-03 | Enright to Cadge letter | Defendants # 405 |
| 68. | 6-9-03 | Enright to Bly letter | Defendants # 532 |
| 69. | 6-10-03 | Enright to Schultz letter | Defendants # 527 |
| 70. | 6-14-03 | IEP with Rejected Portions | Defendants # 26 |
| 71. | 6-14-03 | Revised IEP | Defendants # 49 |
| 72. | 6-17-03 | Transportation Plan | Defendants # 379 |
| 73. | 6-24-03 | Enright to Bly letter | Defendants # 401 |
| 74. | 6-29-03 | Enright to Cadge letter | Defendants ## 225, 520, 661 |
| 75. | 7-3-03 | Enright to Bly letter | Defendants #395 |
| 76. | 7-10-03 | Evaluation Naser M.D. re:C.E. | Defendants # 389 |
| 77. | 7-11-03 | Enright to Bly letter | Defendants # 381 |
| 78. | 7-13-03 | Enright to Thompson letter | Defendants # 51 |
| 79. | 8-6-03 | PA Dept of Special Ed to Enright with Complaint Investigation | Defendants ## 370, 373, 644 |
| 80. | 8-13-03 | Dilsheimer letter to School District | Defendants  # 365 |
| 81. | 8-25-03 | Enright to O'Brien letter | Defendants # 519 |
| 82. | 8-28-03 | Enright to O'Brien and Bly letter | Defendants #419 |
| 83. | 9-03-03 | Dilsheimer letter to O'Brien | Defendants # 363 |
| 84. | 9-09-03 | Settlement Agreement | Defendants |
| 85. | 9-22-03 | Sereni to Dilsheimer letter | Defendants # 359 |
| 86. | 12-18-03 | Enright to O'Brien letter | Defendants # 507 |

PLAINTIFFS PROPOSED EXHIBIT SCHEDULE

| 87. | 7-03-04 | Enright to O'Brien letter | Defendants # 392 |
|---|---|---|---|
| 88. | 7-03-04 | Enright to Bly letter | Defendants # 228 |
| 89. | | School Drivers Manual | Defendants ## 1148-1403 |
| 90. | | Rose Sikley Documents | Defendants   #1433 |
| 91. | | Patricia Cambell Documents | Defendants #1472 |
| 92. | | Phillip DiNardo Records | Defendants ## 976-1040 |
| 93. | | Harry Sheldrake Records | Defendants ## 773- |
| 94. | | Beverly Friel Records | Defendants # 946 |
| 95. | 1-20-05 | Springfield Psychological Testing Evaluation of C.E. | Plaintiff Production |
| 96. | | General Guidelines Bus Drivers | Defendants # 492-498 |
| 97. | | School District Bus Driver Policy 218(a)-Student Discipline Transportation | Defendants # 490-91 |
| 98. | | School District Policy 552- Drug and Alcohol Policy | Defendants # 465-484 |
| 99. | | School District Policy 809 - Video Taping | Defendants # 489 |
| 100. | | School District Policy 810- Transportation Operations | Defendants # 485-87 |
| 101. | | School District Policy 818- Transportation Operations- Contracting | Defendants # 488 |
| 102. | 6-14-01 | Letter Woodlynde School re: CE transporation | Defendants # 204 |
| 103. | 7-26-01 | Letter Ridley School District to Springfield School District re: TP transporation 2001-02 | Defendants #205 |
| 104. | 4-28-02 | CHOP Neurology evaluation | |
| | | | |

PLAINTIFFS PROPOSED EXHIBIT SCHEDULE

| | | | |
|---|---|---|---|
| | | | |
| | | | |

     Plaintiffs reserve the right to supplement this list and to use any document or exhibit identified by any defendant.

VII.    ESTIMATE OF TRIAL TIME

     Plaintiff estimates that their case in chief will take 3 days to present.

VIII.   SPECIAL COMMENTS

     Cassia, the minor plaintiff, is diagnosed with Asberger Syndrome. Accordingly, Cassia's testimony and cross examination may present special issues in accommodating her needs. Counsel requests a conference to discuss this matter. Counsel suggests that when Cassia testifies Mrs. Enright be permitted to sit next to her, that Cassia be permitted to hold her stuffed animal or safe toy and that breaks be permitted, if necessary.

PLAINTIFFS PROPOSED EXHIBIT SCHEDULE

Certain academic and medical records may be subject to State and Federal Confidentiality requirements. Counsel requests a conference to discuss this matter. Counsel has no objection to redaction to the extent that a record, if redacted can be understood by the jury.

Respectfully submitted,

 /s/ Andrew F. Erba (filed electronically)
Andrew F. Erba, Esquire for plaintiff
Williams, Cuker & Berezofsky
1617 J.F.K. Blvd. Suite 800
Philadelphia, PA 19103-2030
215-557-0099
PA I.D. No 20943

PLAINTIFFS PROPOSED EXHIBIT SCHEDULE

**<u>ATTACHMENT A</u>**
**<u>EXPERT REPORT</u>**

**EXPERT REPORT**
**David Rostetter Ed. D.**

The Availability and Provision of
Appropriate Services to C. E.

With Specific Implications
Regarding the Safety of Transportation Services

## I.    INTRODUCTION

A.    <u>Background</u>

1.    This Report is a Supplemental Report which serves to add to and replace the existing

"**Preliminary Analysis and Findings**" previously submitted.  As such, this Report stands alone and

incorporates relevant information from the preliminary analysis.  This Report is also written to meet

the standards for expert reports set out in the federal standards for expert reports.

2.    This Report is provided in response to a request from Mr. Andrew Erba, counsel for the

plaintiffs.  Opinions were sought concerning activities and decisions made of the Springfield School

District, its employees and agents regarding special education and related services provided to C. E.

2.    Each conclusion is provided below.  The rationale and explanation for these conclusions are

provided in Section II., BASIS FOR CONCLUSIONS.

*Conclusions*

**One:** *The District failed, in every respect, to fulfill its obligations as a public agency*
*and educational organization to consider C. E.'s educational and safety needs during*
*the entire period of her enrollment at Springfield School District generally, and in*
*particular during the entire 1001 – 2002 school year.*

**Two:** *The District acted irresponsibly by failing to consider the ages and disabilities of*
*the other students  involved and the potential harmful effect pf such factors and,*

10
*C. E. Expert Report*                    1

*thereby, acted in a manner inconsistent with any educational and policy standards*

**Three:** *The District's procedural and substantive indifference occurred over a prolonged period of time, placed all of the students involved at risk, and resulted in profound and potentially irreversible harm to C. E. her family, and the possibility of the District ever having an effective relationship with C. E. or her family*

B.      Method for Conducting Analysis

1.Basic methods for conducting social research were relied upon in order to analyze existing information and identify those facts that were most relevant and necessary to reach supportable conclusions.  By using those methods, a comprehensive, reliable, and verifiable process results.  Two methods for collection of information were used.  First, documents were collected. These documents included the student's records as well as any depositions, court documents, correspondence, expert reports, and documents from relevant agencies including police, State Department of Education, and the U. S. Department of Education.  After reviewing those documents and identifying specific issues and questions to be addressed, additional information was collected through interviews of the plaintiffs and discussions with other experts.

Following is a description of documents reviewed.  A complete list of documents is at Attachment A.

2.These documents were reviewed using content analysis.  When large amounts of text material are to be reviewed and relied upon to develop and support reliable conclusions, structure for the review must be present.  In this instance every document was read in total.  Then, documents that contained information specifically relevant to the issues at hand were identified.  These documents were then read again.  Trends and major facts were clustered and reviewed.  The entire universe of documents was then read again to ensure that the trends and facts were relevant and did not reflect any type of selective

20
**C. E. Expert Report**                    2

search that might have eliminated or included facts inappropriately.

3.The next step in the process was to seek out any information that might clarify, support, or call into question, trends identified through the review of documents.  The information collected through interviews was then added to the document information and all information was sorted into categories that were used to describe an entire social setting.  This social setting was examined and conclusions were derived regarding the issues being studied.  All available information was then reviewed once more to ensure consistency and thoroughness.

4.This method of social research is called qualitative research and relies on ethnographic techniques used by social researchers.  I employ these techniques any time my expertise is to be relied upon.  The results of these techniques are the conclusions and facts set forth in this report.

## II.      BASIS FOR CONCLUSIONS

5.There are two criteria used to determine the whether C.E. had available to her appropriate program and services at the time of the accident.  These two criteria are standards of public policy and standards of acceptable practice.  Public policy standards are set out in laws, regulations, court decisions, and policy documents and guidance set forth by cognizant public agencies

6.The second criteria are standards of acceptable practice set forth in literature about special education, manuals and procedural documents used at state and local levels, and developed and observed through review of thousands of student files and participation in IEP meetings over the last twenty years.

7.These two criteria were used as a basis for comparison to determine if the District did what is required and acceptable in the field of education, and special education, in particular.

### *Conclusion One*

30
*C. E. Expert Report*                    3

*The District failed, in every respect, to fulfill its obligations as a public agency and educational organization to consider C. E.'s educational and safety needs during the entire period of her enrollment at Springfield School District generally, and in particular during the entire 1001 – 2002 school year.*

8.Special education is defined as 'specially designed instruction to meet the unique needs of the child".

Because special education involves assessments and services that are individualized, and potentially quite intrusive, public schools must adhere to prescribed procedures in making the determination that a student might need special education.  These procedures are set out, in part, in law and regulations.

They are implemented by qualified professionals who must also exercise judgment making  decisions regarding the education of students.

9.Students who receive special education as well as students suspected of needing special education services are considered to be members of a :vulnerable minority"

10.As members of this group, public policy and educational practice extends certain protections to preserve and protect their access to services and the availability of a "free appropriate public education" (FAPE)

11.These procedural and substantive protections include the following obligations placed on local education agencies:

1.Prior written notice whenever the District initiates, or refuses to initiate, a change in the identification, evaluation, placement, or provision of FAPE;

2.The notice must contain a full explanation of the parental rights as well as information about the proposed, or refused action;

3.An individualized decision making process that includes:

1.A Team of people including the child's regular education and special education teachers; an agency representative who can allocate resources, the child's parent(s), and other s[ecia;ized

40
**C. E. Expert Report**                                 4

    personnel if appropriate;

2. Decisions made by this Team including the evaluations to be conducted, determinations of eliginility for services, the content of the child's Individualized Education Program (IEP), and the placement of the child in a specific program of services.

3. The decisions and outcomes of the Team (IEP and placement) must be reviewed at least annually and all decisions are subject to review by impartial hearing officers.

.

4. All of these characteristics of the protections offered to students with disabilities embody sound educational practice.

5. Informed family participation is the single factor most highly correlated with student performance and positive perceptions of education

6. Individualized attention and decision-making is not only desirable but known to be essential to educational progress.

7. These essential ingredients are required components of special education services and are part of the definition of FGAPE in federal and state policy.

8. While minor procedural failures are not generally considered to be "fatal flaws" on an educational program, major breaches in the web of procedural and substantive protections are usually taken very seriously by compliance staff and the courts.

9. When harm or decreased educational benefit are combined with procedural errors, non-compliance and liability concerns are significantly increased.

10. However, in this case, the sometimes complex balancing of procedural flaws And benefit, or l;ack of benefit, is not at all necessary.

11. The fact is that C. E. and her parents were denied **every** procedural safeguard and substantive protection – **every single one** during the school year 2001 – 2002.

50
**C. E. Expert Report**          5

12. In thirty years of doing this work, including ten years as a federal compliance official, a consultant to federal courts, and an expert in over seventy – five cases, I have never seen such an absolute failure to even consider the obligations to provide an appropriate education to a child.

13. There is no documentation that demonstrates that any of the required activities occurred since C. E. entered the school age program of the District after being served by the Delaware County Intermediate Unit as a preschool child.

14. Subsequent to the preschool  program a Settlement Agreement placed C. E. at Woodlynde School for the 200 – 2001 school year.

15. There is no record of contact between Woodlynde School and the District during the 2000 – 2002 school year.

16. The District did not appear to exercise public control or supervision of the program which is part of their responsibility to ensure FAPE.

17. This pervasive lack of interest is evident throughout this period and is indicative of an our of sight, out of mind attitude that is partly the cause of the District's unprecedented failures.

18. The Settlement Agreement required that an IEP Team meet to consider the continuation of the Woodlynde placement after the 12001 -2002 school year.

19. This meeting did not occur, despite being one of the requirements of the Settlement.

20. No invitations or notices of such a meeting have been produced,  No record of such a meeting has been produced,  No IEP has been produced.  No notice of Recommended Assignment has been produced.  No review of the program was conducted by District in any formal or documented way.

21. C. E. entered the 2—1 – 2002 school year without any requirements of acceptable practice or public

60
**C. E. Expert Report**                                6

policy in place.  It was as if 30 years of special education law, cases, practice, and advances had never occurred.

22.During the first semester, the District decided to save money by collapsing two bus routes.  For C. E., this was done by a phone call from Ms Pat Schultz of the transportation department of the District.

23.Ms. Schultz is, admittedly, and demonstrably, unaware of  disability issues regarding the students she is responsible for transporting.

24.Nonetheless, she changed the transportation arrangements for C. E. unilaterally and assured her mother that it would be Okay when the mother expressed concern about C. E. being on a bus with teenage boys for a long period of time.

25.Not surprisingly, none of the normal concerns about revising an IEP unilaterally without the Team or notice of such changes came up because C. E. had no IEP and no notice gad ever been provided about anything by the District in the past anyway.

26.However, the change in buses involved another little boy.  This youngster had an IEP and his parents objected, no doubt having been part of such a process in the past.  They requested a hearing on the matter and the little boy was eventually assigned an aid to travel with him the three days he was on the bus.

27.He was fortunate.  What this event shows is the willful and deliberate lack of concern about the right of C. E.  which are to be guaranteed by the District.

28.Having been through he process of considering an aid for the other youngster, any responsible official would have then considered her needs for such support being a young female in this situation.

29.The District did not do this.  They ignored her demonstrated need for such support and only gave

70
**C. E. Expert Report**                    7

support to the people who sued them.  This is, frankly, very disturbing to a career educator such as

myself.  What about this little vulnerable girl and the two days a week the adult aid was not on the bus?

I believe those responsible should actually have their credentials revoked given the seriousness of their

failures and their "bury your head in the sand" behavior.

### Conclusion Two

***The District acted irresponsibly by failing to consider the ages and disabilities of the other students  involved and the potential harmful effect pf such factors and, thereby, acted in a manner inconsistent with any educational and policy standards***

30.Conclusions One focuses on the facts concerning the Distruct's lack of adherence to any of the long

existing standards concerning the educational decision –making process that should have been in effect.

31.This conclusion deals with the substantive information available to the District when the incident

occurred.

32.As a related service that is considered to be part of the IEP and placement decision, the participation

of specific students in transportation is  subject to the standards governing placement.

33.When changing her transportation services, the District should have considered any potential

harmful effect on C. E.  This is true, of course, when a school district makes any decision concerning a

student

34.In this student's case, failing to consider her placement on the specific  bus route in the context of

her disability and its unique characteristics is simply reckless and indifferent.

35.C. E., as a young student whose disability is considered on the with Asberger's Disorder, can be

characterized as having difficulty with communication and social skills.

80
**C. E. Expert Report**                              8

36.In fact, every evaluation in her educational record speaks directly to the fact that C. E. is not capable of making appropriate decisions in social situations.

37.This is true of both evaluations conducted by Dr,   .Barbara W. Domingos, a neuropsychologist who first evaluated C. E. in August, 1999.  The District then specifically asked Dr. Domingos to reevaluate C. E. In December of 2001 that yielded a report in March 2002.

38.On March 5, 202 Dr. Domingos reported that C. E. " had at times required support to maintain appropriate social boundaries with strangers" and she… "was sometimes impulsive"

39.In August 1999. Dr. Domingos described her heed for "Safety knowledge, like appropriate caution with strangers" (Recommendations, Number 6 (i)).

40.The District had specific knowledge about her when the referral for transportation was made to the District on December 15, qo98.  The Transportation Request Form stated "runs away- not aware of dangers-will run in front of ….. must hold her hand.

41.This repeated warning if C.E's vulnerability is the only information concerning this issue and it is repeated numerous times.  No information to the contrary exists.  The District has no basis to assume anything but the fact that C. E. was vulnerable as documented by its own evaluations.

42.Additionally, her disability itself has, as an essential characteristic, vulnerability in social situations. The history of C.E. is one of abuse after abuse at the hands of knowingly harmful people and even just people who know better.  The personnel in transportation and special education involved in decisions concerning her safety and vulnerability had the information, knew better and did nothing normally required.

43.No social/sexual curriculum is evident even though it is standard practice in any such child's

90
**C. E. Expert Report**                               9

program

44.Students such as C. E. have great difficulty reading and interpreting normal social cues.

45.They are frequently incapable of discerning inappropriate behaviors from appropriate behaviors.

Additionally, cues regarding danger and threat are not distinguishable from other benign indicators.

46.In short, C. E. is extraordinarily vulnerable in any unsupervised social situation.

47.She does not communicate appropriately when confronted with any nuance or subtleties and not

likely to select an appropriate response when necessary.

48.The decision to place such a student in a situation where she might be exposed to normal adolescent

students without supervision is unacceptable.

49.The decision to do so without consideration of any potential harmful effect is, frankly, outside the

norm to be reasonably expected from this or any public or private education

50.Age-appropriate services and placements have been a standard of practice in special education for

twenty-five years.

51.Special education literature is unanimous in its support for the standard that appropriate

instruction, and appropriate services, must be provided to students  in groups of students of similar

chronological ages.

52.Age-appropriate instruction and placement has been supported by the Office for Civil Rights and

the Office of Special Education Programs since the inception of Section 504 of the Rehabilitation Act

and the Education of the Handicapped Act (now the Individuals with Disabilities and Education Act

(IDEA)).

53.Age-appropriate instruction and placement means that a student will be with their  similar age peers

so that their social development and instructional skills will allow them to interact appropriately with peers.

54.The converse is to have elementary age students with high school age students or high school age students learning skills at a social level of a five or six year old.  Students who would behave and interact in such age diverse settings will never be appropriately integrated and never be successful.

55.The fundamental rationale of social appropriateness also speaks directly to safety.  For years, students with disabilities were particularly vulnerable to inappropriate advances and sexual assaultive behavior.

56.Rape and sexual abuse among students with mental retardation has been particularly problematic in schools throughout the nation.

57.Similarly, young students with autism are also at significantly increased risk due to their well documented problems with socialization and communication.  Clearly, placing a young student in a situation with non age-appropriate peers who are older is inconceivable.

58.However, in this instance the failure to adhere to the age-appropriate standard is significantly exacerbated by the fact that the other students are not only older, they are students with serious emotional/behavioral  problems that require the most restrictive educational placements allowable under law.

59.In Pennsylvania, only 1.21 percent of students are in private school placements.  Even among students with emotional disturbances only 6.55  percent are placed in such highly specialized settings.

60.Devereaux School is manifestly designed to serve students with serious emotional/behavioral problems.  Yet, C. E., a primary school age student, is placed on a bus with an adolescent male who has

110
**C. E. Expert Report**                 11

been placed in

61.Devereaux precisely because his emotional/behavioral problems require the most intensive

interventions.

62.The extent of emotional and behavioral support needed by both of the adolescent boys involved in

the incident and on the bus was also known to the District.

63.In fact, Dr. Bly, the Director of Special Education actually participated in the IEP meeting for J. W.

64.He was personally aware of the compulsive and disruptive nature of his needs. Dr. Bly led the

meeting which identified J. W. as having an emotional disturbance and placed him in a school for

students with serious emotional and behavioral disorders.

65.While I was a Special Master in the Chester Uplands School District (CUSD), I was responsible for

oversight of services available to students with serious emotional and behavior disorders.

66.In that capacity I reviewed the programs and placements of every student placed by CUSD in

special education.  I worked with   Devereaux personnel, visited their facility, and continuously

monitored those services.

67. Devereaux School placement  requires state approval for reimbursement and represent an

intervention provided to only those students with extraordinarily serious emotional and begavioral

problems.

68.Dr. Bly knew this.  He also knew the nature of the problems that C. E. deals with on a daily basis

and her extraordinary social end communication needs. needs.

69.Dr. Bly participated in the Settlement Agreement that resulted in her out of district placement.  He,

unilaterally decided to continue that placement absent compliance with the provisions of the

120
**C. E. Expert Report**                    12

Agreement.

70. He also requested the evaluations conducted by Dr. Domingos in February, 2002.

71. Dr. Bly also directly participated in the assignment of the aide to the male student on the very bus that C. E. rode. That aid was assigned due to the Parents' request for a due process hearing and legal proceedings against the District.

72. Information sufficient for the District administrators to make an appropriate decision for C, E. was available to those responsible for her education.  It simply was ignored, resulting directly in the incident of April 22, 2002.

73. The District was also irresponsible in its preparation of drivers.  Every deposition verifies that no training was provided by the District concerning disability and special education beyond the very general training available when applying for a license.

74. Certainly, information and training should be made available to drivers who transport students who require extraordinarily restrictive and controlled environments such as Devereaux.

75. The decision to change the transportation arrangements unilaterally, with no additional supports ir training is an unintelligible decision in the context of existing literature, applicable standards of practice, and any reasonable consideration of a student's needs.

76. The District educational  personnel, its special education management, and the administration were simply irresponsible by failing to consider who was on the bus, what supervision was necessary, and what her educational needs required.  Administrative convenience, rather than the interest of safety and security was the criteria for this very bad decision.

*Conclusion Three*

130

*C. E. Expert Report*                          13

***The District's procedural and substantive indifference occurred over a prolonged
period of time, placed all of the students involved at risk, and resulted in profound
and potentially irreversible harm to C. E. her family, and the possibility of the District
ever having an effective relationship with C. E. or her family***

77. The effect of the incident was immediate and profound.

78. C. E. continues to struggle with anxiety and dears related to the incident.

79. Yet, the District's response to her trauma and the anguish it has caused her family can be characterized as inadequate, purposefully indifferent, and calculated to avoid the obvious responsibility to avoid its occurrence.

80. The proof of these serious assertions can be found in the District's actions subsequent to the incident of April 22, 2002/

81. Prior to the incident. an IEP meeting was scheduled for April 30, 2005.  The meeting was held.

82. The meeting was titled a "revision" meeting, as if there were an IEP in place to be revised.  The fact is, there was no IEP and C. E. had not had one since her enrollment at Springfield as a school-age student almost three years earlier.  Apparently, the District was attempting to characterize the meeting as something it could not possible be.  This is, at best, a serious error.  At worst, ir is an effort to create a record that belies the District's obvious failure to make an appropriate program available throught the IEP process.

83. More disturbing is the fact that the District places a new label on C. E. with no comprehensive assessment or determination of eligibility whatsoever.  Suddenly, she is labeled of a student with Post Traumatic Stress Disorder (PTSD).  On what basis?  There is no documentation in the record that supports this conclusion on the part of the District at this time.

140
**C. E. Expert Report**                                   14

84.PTSD, in this instance, is actually a new category of eligibility.  The  label is extremely stigmatizing and has long lasting negative implications for school discipline, programming, and employment.  Yet the District labels her.

85.Before doing so, the District was obligated to conduct a thorough analysis of her suspected disability.  Such an analysis should have included the collection of sufficient information to confirm the label and make decisions about the **educational implications and programming**  resulting from the label.

86.The District IEP fails to evaluate the incident that apparently caused this diagnosis.  Again, the District attempts to avoid its responsibility for the arm causing the PTSD as if not writing it or saying it takes care if the matter.  This is totally irresponsible and represents on intentional indifference that is unexcusable.

87.The resulting IEP itself confirms the District's failures.  Not one goal addresses the need for C. E. to actually learn the necessary information and skills to protect her in the future.

88.Rather, the District includes a minimal "safety plan" designed primarily to protect the District from further liability.  Nothing in the "safety plan" helps her to learn.  It is all about surrounding her with adults that can prohibit others from approaching her or exposing her to dangerous situations.

89.C. E. is supposed to be the beneficiary here.  There are numerous, and well known, curricula available precisely for this population to learn social/sexual information and skills.  Yet, the District proposes none of it in the IEP.  This IEP us about the District, not C. E.

90.Also missing is intense psychotherapy of psychiatric support for her at District expense.  Ironically, such services are available to the suspected offenders as part of their routine program at

150
**C. E. Expert Report**                    15

Devereaux School.  The absence of these services are not the result of a District policy to not provide such services.  The absence of these services appears to be specifically aimed at C. E.

91. It is indisputable that her family has suffered as well.  At the time of the IEP meeting, nothing was specifically made available to the family in the form of counseling or training.  Remarkable, the District has a crisis plan when a student, or groups of students (disabled or not) suffers some school related trauma.  Counseling and support for the whole community might be made available through the resources of the District.  However, C. E. and her family are afforded no such support.

92. Instead of the many activities the District could have engaged in on behalf of C. E. and her family, the District engaged in an effort to minimize, and even ignore the incident itself.  No independent investigation or assessment of the situation was conducted or initiated by Mr. Bly.  Rather, the family started having its inquiries answered by lawyers.

93. When it came time to attempt to ensure continued services for C. E. outside the District, the parents were threatened with the possibility of C. E. losing her external placement if they didn't agree to what the District was offering.

94. Here is a traumatized family with a young child whose disabilities have been exacerbated by the District, being treated as if they were the problem.

95. This family and their child should have been wrapped in the good will of the educators involved, supported at every turn, and provided with every opportunity imaginable to restore confidence and trust in the public school system  The record indicates exactly the opposite.

96. *SUMMARY*

I have worked with school district, states, federal agencies, families, and organizations for thirty years.

160
**C. E. Expert Report**                    16

Despite often difficult and very contentious circumstances, I have tried to work to advance educational policy on behalf of students and professionals alike.  In this role, I have not encountered many situations where a school district failed so pervasively in the first instance and then did so little to address the results following those failures.  I do a great deal of work with a law firm that only represents school districts.  That work always starts with the proposition that everything must be done for the child in their educational interest before defending the incident.  In other words, even if it went wrong initially, let's at least make sure that we have an educationally and ethically defensible program now.  Springfield School District did not do this.  For that, I believe, for the sake of sound public policy and conscientious professional practice, they must be held accountable in every possible way available.

## III.  PREVIOUS TESTIMONY

**Federal Testimony**

Zachary D. v. Hamilton County Board of Education:  Expert witness concerning the availability of FAPE to a young child with autism.  Testimony was taken in U. S. District Court.

A. S. v. Collier County School Board:  Case concerning the availability of a free appropriate public education to a learning disabled student who had completed all high school requirements for graduation.

Emma C. v. Eastin:  Provided testimony on behalf of plaintiff class seeking school district be held in contempt for failure to comply with the IDEA.

K. C. v. Collier County School Board:  Testimony on behalf of the School Board regarding the provision of FAPE to an adolescent middle school student with behavioral and physical disabilities.

Angel G. v. Texas Education Agency:  Expert for students residing in residential care facilities in an effort to compel the Texas Education Agency to ensure appropriate services to such students and to develop an effective monitoring system.

<u>Duane B. v Chester Upland School District</u>:  Court appointed expert and chair of an Evaluation Team to assist the parties in the development of strategies and activities to ensure compliance and improve the delivery of educational services to all students with disabilities.

<u>C.A.R.C. v. Tirozzi</u>:  Expert witness for the Connecticut Association of Retarded Citizens in a case against the State regarding the failure of the State to assure provision of special education in the least restrictive environment.

<u>Alabama Coalition for Equity v. Guy Hunt</u>:  Expert regarding the effect of methods of administration upon the availability of free appropriate public education.

<u>Coalition to Save Our Children v. Wilmington Public Schools</u>:  Conducted an analysis of the relationship between race and special education eligibility and placement.  The analysis and testimony is being provided at the request of the Lawyers' Committee for Civil Rights.

**Rule 706 Expert:**  Appointed to advise the Court in the matter of <u>Cory H. v. the Chicago Public Schools and the Illinois State Board of Education</u>.  This case focuses on educating students with disabilities in the least restrictive environment and the role the State must play in assuring it complies with IDEA's placement requirements.

<u>Santoro v. Kettle Moraine School District</u>:  Expert for the District contending that the student's placement should be in a regular school rather than a separate school.

<u>Thomasville NAACP v. Thomasville City Schools</u>: Conducted an analysis of the relationship between race and special education eligibility and placement.  The analysis and testimony is being provided at the request of the Lawyers' Committee for Civil Rights.

<u>Michigan Protection and Advocacy Services</u>:  Expert services provided to determine the extent to which the Michigan Department of Education uses proper methods of administration in its investigation and resolution of complaints.

<u>Solomon C. v. Chester Upland School District</u>:  Witness concerning a student and alleged physical harm and failure to make available appropriate services.

<u>O.F. v. Chester Upland School District</u>:  Witness concerning a student who alleged emotional harm and failure to make available appropriate services.

<u>Adam B. v. State of Delaware</u>:  Least restrictive environment case involving application of methods of administration in the placement and service of youngsters with mental retardation.

180
**C. E. Expert Report**                    18

Vaughn G. v. Amprey:  Appointed by the District Court of Maryland to review policies and practices implemented by Baltimore Public Schools and make recommendations regarding school efforts and issues related to compliance standards contained in an existing Consent Agreement.

**Other Testimony**

S. K. v. Las Virgenes School District:  Testimony concerning the placement of a student with autism in the least restrictive environment.

A. H. v. Magnolia School School District:  Testimony concerning a preschool student with autism and the appropriateness of services made available by the district.

A. D. v. Okaloosa County Schools:  Expert assistance and testimony concerning the procedures and activities of the school district during the conduct of external and internal student evaluations.

Goodrich v. Twin Falls Public Schools.  Federal District case concerning provision of appropriate services to an adolescent youngster suspected of being learning disabled.

Andrew G. v. Dade County Public Schools:  Expert witness concerning appropriate programming and services to a middle school student with behavioral problems and a learning disability.

K. N. v. Gwinnette County Schools:  Assistance in determining the need for residential placement for an elementary school student.

R. M. v. Gwinnette County Public Schools:  Assistance to the school district to design an inclusive program for the student and testimony in support of those proposals.

Joshua B. v. Fayette County School System:  Witness concerning provision of services in the LRE to preschool student.

L. K. v. Knox County Public Schools:  Expert concerning the provision of appropriate services to a student in a regular public school when the parent has made claims for reimbursement for payment of tuition in a residential facility.

C. H. B. v. Hendry County School Board:  Analysis and testimony concerning the appropriateness of the decisions made by Hendry County school staff to serve the student.

Stephen J. Blackwelder v. Florida School for the Deaf and Blind:  Case regarding the placement and services afforded by FSDB and the extent of its obligation to make FAPE available to a deaf/blind student.

190
**C. E. Expert Report**                     19

Justin T. v. Wytheville County Schools:  Expert witness for the school district concerning a seriously emotionally disturbed child and the extent to which the child could participate in the regular education classroom

U. v. Montgomery County Maryland Public Schools:  Witness on behalf of the student's claim to a fully integrated placement in her neighborhood school.

Jeremy H. v. Mount Lebanon School District:  Due process hearing regarding FAPE for a student with low vision and a learning disability.

Barnett v. Fairfax County Public Schools.  Federal District Court case concerning education in the least restrictive environment.

Defries v. Fairfax County Public Schools.  Federal Circuit Court case concerning the provision of appropriate education to a youngster with autism.

## IV    QUALIFICATIONS

Dr. Rostetter's Vita is attached (Attachment B).  A summary of his qualifications and

experience follows.

Degrees earned are:

Ed. D.  State University of New York at Albany
        Education Administration

M. S.  State University of New York at Albany
       Education Administration

B. S.  SUNY College at. Fredonia
       Political Science

I have been a consultant to local educational agencies, state educational agencies, the U. S. Departments of Justice, Education, and Health and Human Services since leaving the U. S. Department of Education in 1986. While at the U.S. Department of Education, I carried out a number of assignments including: Director of the Division of Assistance to States with responsibility for the administration of IDEA-B and relevant EDGAR requirements through review of state education plans, awarding of funds, monitoring and the provision of technical assistance to states.

I have served as the Special Assistant to Madeleine Will, Assistant Secretary, Office of Special Education and Rehabilitative Services (OSERS) and was responsible for preparation of congressional testimony, liaison with OSERS organizational units, the Office for Civil Rights, and external affairs.

Of particular importance is my direct involvement in the review of over fifteen thousand IEPs and participation in over three hundred IEP meetings.  His experience provides a broad base upon which to assess the relative uniqueness and appropriateness of a school district's efforts to serve a student.

Selected Recent Work Experience:

- **Associate Professor,** St. Johm Fisher College, Rochester, N. Y.

- **Consultant:**  Providing assistance to the Ravenswood City School District to achieve compliance with federal an state laws and Court Orders resulting from <u>Emma C. v. the Ravenswood City School District and the California Department of Education</u>.  Assistance includes the development of new policies and procedures, staff development, assessing student programs and evaluating overall district performance.

- **Consultant:**  Assistance to the Fayette County Public Schools, Fayette, Ga., in designing and implementing a comprehensive preschool program for students with developmental needs as well as non-disabled preschoolers.

- **Special Master**:  Federal court appointed Special Master in <u>Duane B. v. Chester Upland School District and the Pennsylvania Department of Education</u>. Responsibilities include oversight and enforcement of Stipulations and Orders as well as assistance to the District in complying with state and federal law.

- **Consultant:**  Providing assistance to the California Department of Education in the design and implementation of a new monitoring system using focused monitoring approaches.

- **Monitor:**  Selected by both parties to monitor implementation of a Settlement Agreement in <u>D. J. v. Arizona Department of Education</u> concerning Arizona efforts to implement an effective complaint management system.  Expert report filed supporting the plaintiff's claim that the class did not have available proper methods of administration to investigate and resolve complaints.

- **Consultant**:  To the State of Ohio and the Ohio Associations of Elementary and Secondary School Principals for the development and implementation of project APEX. Project APEX provided training to approximately 1500 principals on the history and implementation of legal and appropriate inclusive practices.

- **Evaluator:**  Beaufort County Schools.  A review of effectiveness of special education and recommendations regarding cost savings and improved programming.  Similar Report was also completed for the Clark County Schools in Las Vegas, Nevada.

- **Evaluator:**  Reports for federal courts in Baltimore and Philadelphia on special education programs as well as work with the Office for Civil Rights and the states of Massachusetts and Illinois in assisting in developing appropriate responses to program deficiencies.

- **Consultant:**  To the State of Alabama for the development of a Remedy Plan and School Reform Initiative.  Participated in the development of all aspects of a Comprehensive plan to improve the Alabama public school system with an emphasis on school equity and quality education.

- **Consultant**:  To the Commonwealth of Pennsylvania on the implementation of the necessary initiatives and structural changes to implement the <u>Cordero</u> Court order which requires the interagency provision of services to students with disabilities in need of services from many different community based agencies.

## IV.    COMPENSATION

I am compensated at the rate of $175 per hour.

220
**C. E. Expert Report**                          22

CERTIFICATE OF SERVICE

It is certified that a copy of the within Pretrial memorandum was served on the, by depositing it with the United States Mail, postage prepaid addressed to:

Ellis Katz, Esquire
Sweet, Stevens, Tucker & Katz, LLP
331 East Butler Avenue
Post Office Box 5069
New Britain, PA 18901

George P. Noel, Esquire
25 E. Second Street P.O. Box 159
Media, PA 19063

Joseph Malley, Esquire
205 North Monroe Street
P.O. Box 689
Media Pa, 19063

S. Stanton Miller, Esquire
Dunn and Miller
211-213 North Olive Street
P. O Box 747
Media, PA 19063

/s/ Andrew F. Erba

dated: October 20, 2005

230
**C. E. Expert Report**

240
**C. E. Expert Report**                    24