## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CASSIA ENRIGHT, a Minor and  : CIVIL ACTION
DONALD ENRIGHT and SANDRA   :
ENRIGHT, as Parents and     :
Guardians of CASSIA ENRIGHT  : NO. 04-CV-1653
and DONALD and SANDRA ENRIGHT :
in their own right        :
                            :
      vs.            :
                            :
SPRINGFIELD SCHOOL DISTRICT   :
                            :
      vs.            :
                            :
J.W. and T.P. a Minor in his  :
own right and by and through  :
his Parents and Guardians    :
J.P. and W.P.               :

## MEMORANDUM AND ORDER

**JOYNER, J.**                                       **December 27, 2007**

      This civil rights action is now before the Court for disposition of the Springfield School District's Renewed Motion for Directed Verdict Pursuant to Fed.R.Civ.P. 50(b) and/or Motion for New Trial Pursuant to Fed.R.Civ.P. 59.  For the reasons which follow, the motion is denied.

## History of the Case

      This case arose out of an incident which occurred on April 22, 2002 on a school bus owned and operated by the Springfield (Delaware County) School District.  That afternoon, the Springfield School District was transporting three students - J.W., then 17 years of age and a student at the Devereaux Day

School in Downingtown, Pennsylvania, Plaintiff Cassia Enright,
then 7 years old, and T.P., then 14, both students at the
Woodlynde School in Strafford, Pennsylvania home from their
respective schools.  Almost from the moment that T.P. and Cassia
boarded the bus, the boys began to engage in "horseplay" that
included swearing and talk of a sexual nature and which
eventually escalated to the point that  both of the boys asked
Cassia to give them her umbrella.  Cassia acquiesced and gave the
umbrella to T.P. who then proceeded to use it to rub and scratch
himself in his genital area, while purportedly uttering
inappropriate noises and facial expressions.  From all
appearances, T.P. was encouraged by J.W.'s laughter and responses
to the effect of "Look, he's playing with himself."  At some
point, which is not entirely clear, T.P. also showed J.W. a scar
which he had received from playing paintball.  The scar was
evidently located on T.P.'s upper thigh and in order to display
it, T.P. pulled up his shorts which resulted in the exposure of
his penis.  Cassia apparently witnessed this display and the boys
then began to urge her to "touch it, feel it, lick it," although
it is unclear whether the object they were referring to was the
umbrella or the penis.  Cassia thereafter refused to touch her
umbrella and at or around this time, J.W. also grabbed and pulled
Cassia's hair.  When it became clear to the boys that Cassia was
upset, they told her that if she left her umbrella on the bus her

mother would be angry with her, and that if she told anyone what had gone on, no one would believe her and J.W. would either hurt or kill Timothy, Cassia's older brother, who sometimes also rode the bus to and from the Hilltop School which he attended.

Immediately after disembarking from the bus, Cassia told her father that something bad had happened on the bus and she needed to talk to her mother.  In keeping with the previously arranged plan for a play date at a nearby friend's house, Mr. Enright took his daughter there but promptly telephoned his wife.  Mrs. Enright, who had worked the night shift at her job the night before and was sleeping, agreed to come over.  Upon her arrival, she and Cassia spoke privately and Cassia informed her of the events on the bus that afternoon.  Seeing that Cassia was badly traumatized, Mrs. Enright then called the Springfield School District's offices and spoke with the Assistant Transportation Director, Patricia Schultz and the Springfield Police Department. The boys were immediately removed from the bus and were eventually prosecuted through a program for juveniles.

J.W. had an extensive history of disruptive and aggressive behavior while a student in the Springfield Public Schools. Following a fight in which he whipped his younger brother with fishing line, cursed out his mother, tackled his father and then threatened suicide with a pellet gun, J.W. was diagnosed as having oppositional defiant disorder and it was agreed that his

needs would be best served by his attendance at the Devereaux Day School, which specializes in the education and treatment of emotionally disturbed and learning disabled children.  T.P., who was actually a student in the Ridley School District, was attending Woodlynde School to receive treatment and therapy for dyslexia, a learning disorder.  Cassia Enright had been diagnosed at the age of 3 as having Attention Deficit Hyperactivity Disorder ("ADHD") and Asperger's Syndrome, a developmental disorder in which the child has severe difficulty in understanding non-verbal cues or how to interact socially with others but normal to above normal intelligence, and which may be characterized by an abnormally high vocabulary, clumsiness and difficulty with fine motor skills.  Thus, although she had an actual age of 7 ½ at the time of this incident, she had a social age of just 5.

Although the boys were never again transported with Cassia and a number of accommodations were made in her transportation program, including the placement of a female aide on the school bus with her, Cassia suffered severe setbacks in her educational and developmental progress.  She became increasingly clingy to her mother and fearful of teenage boys as well as for her own and her brother Tim's safety, refused to allow her father to touch her or express affection to her, suffered from frequent panic attacks, sleep disturbances and episodes of uncontrollable crying

4

and on at least two occasions, attempted to harm herself.  She came under the treatment of a psychiatrist, Dr. Jeffrey Naser and a clinical social worker, Laura Silverstein and, while her condition has improved, Cassia continued to receive treatment for the incident over the course of the next several years.

Donald and Sandra Enright commenced this lawsuit in April, 2004 against Springfield School District and Dr. Joseph O'Brien, its then-superintendent, alleging causes of action under 42 U.S.C. §1983 for violations of Cassia's civil rights and the Americans with Disabilities Act, 42 U.S.C. §12101, *et. seq.*, Section 504 of the Rehabilitation Act, 29 U.S.C. §794, the Individuals with Disabilities Education Act, 20 U.S.C. §1400, *et. seq.*, and the First and Fourteenth Amendments to the U.S. Constitution.  The case was tried before a jury over the course of six days, from November 27 - December 5, 2006.  The jury returned a verdict in favor of the plaintiffs and against the defendant School District in the amount of $400,000 and in favor of the School District on its claims for indemnity from J.W. and T.P. in the amount of $1.00 each.[1]  The School District now moves for the entry of directed verdict in its favor or, alternatively for a new trial.

---

[1]  At the close of the plaintiff's case, the Court granted the motion for dismissal of the case against Dr. O'Brien finding that he was entitled to qualified immunity.  None of the parties has filed any post-trial motions challenging this decision.

## Standards Governing Motions Under Fed.R.Civ.P. 50(b) and 59

Fed.R.Civ.P. 50 states the following in pertinent part:

**(a) Judgment as a Matter of Law.**

**(1) In General.** If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may:

**(A)** resolve the issue against the party; and
**(B)** grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

**(2) Motion.** A motion for judgment as a matter of law may be made at any time before the case is submitted to the jury. The motion must specify the judgment sought and the law and facts that entitle the movant to the judgment.

**(b) Renewing the Motion After Trial; Alternative Motion for a New Trial.** If the court does not grant the motion for judgment as a matter of law made under subdivision (a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. The movant may renew its request for judgment as a matter of law by filing a motion no later than 10 days after the entry of judgment or - if the motion addresses a jury issue not decided by a verdict - no later than 10 days after the jury was discharged. The movant may alternatively request a new trial or join a motion for a new trial under Rule 59.

In ruling on a renewed motion, the court may:

**(1)** if a verdict was returned:

**(A)** allow the judgment to stand,
**(B)** order a new trial, or
**(C)** direct entry of judgment as a matter of law; or

6

**(2)** if no verdict was returned:

> **(A)** order a new trial, or
> **(B)** direct entry of judgment as a matter of law.

....

Rule 59 similarly requires that motions for new trial be filed within 10 days of the entry of the judgment and provides as grounds therefor:

> A new trial may be granted to all or any of the parties and on all or part of the issues (1) in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States; and (2) in an action tried without a jury, for any of the reasons for which rehearings have heretofore been granted in suits in equity in the courts of the United States.  On a motion for a new trial in an action tried without a jury, the court may open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new findings and conclusions, and direct the entry of a new judgment.

Fed.R.Civ.P. 59(a).

Under Rule 50, a court should render judgment as a matter of law when "a party has been fully heard on an issue" and after reviewing all of the evidence in the record.  <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 149, 150, 120 S.Ct. 2097, 2110, 147 L.Ed.2d 105 (2000), quoting Fed.R.Civ.P. 50(a).  Entry of judgment as a matter of law is a "sparingly" invoked remedy, "granted only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability."  <u>Marra v.</u>

<u>Philadelphia Housing Authority</u>, 497 F.3d 286, 300 (3d Cir. 2007),
quoting <u>Moyer v. United Dominion Industries, Inc.</u>, 473 F.3d 532,
545 n.8 (3d Cir. 2007) and <u>CGB Occupational Therapy, Inc. v. RHA
Health Services, Inc.</u>, 357 F.3d 375, 383 (3d Cir. 2004).   In
performing this narrow inquiry, the court must refrain from
weighing the evidence, determining the credibility of witnesses,
or substituting its own version of the facts for that of the
jury.  <u>Id</u>.; <u>Lightning Lube, Inc. v. Witco Corp.</u>, 4 F.3d 1153,
1166 (3d Cir. 1993).  Further, a district court "must disregard
all evidence favorable to the moving party that the jury is not
required to believe," <u>Springer v. Henry</u>, 435 F.3d 268, 281 (3d
Cir. 2006), quoting <u>Reeves</u>, 530 U.S. at 151, and "give credence
to the evidence favoring the nonmovant as well as that evidence
supporting the moving party that is uncontradicted and
unimpeached, at least to the extent that that evidence comes from
disinterested witnesses." <u>Steward v. Sears Roebuck & Co.</u>, No.
06-3360, 231 Fed. Appx. 201, 207, 2007 U.S. App. LEXIS 19365 at
*17 (3d Cir. Aug. 14, 2007), quoting <u>Reeves</u>, <u>supra</u>.  Thus, if
satisfaction of an essential element of a claim for relief is at
issue, the jury is the proper trier of contested facts.  <u>Arbaugh
v. Y & H Corp.</u>, 546 U.S. 500, 514, 126 S.Ct. 1235, 1244, 163
L.Ed.2d 1097, 1109 (2006).

In contrast to judgment as a matter of law, ordering a new
trial is squarely within the sound discretion of the district

court.  Dowd v. SEPTA, Civ. A. No. 04-CV-294, 2006 U.S. Dist.
LEXIS 30619 at *17 (E.D. Pa.  2006), citing Bonjourno v. Kaiser
Aluminum & Chemical Corp., 752 F.2d 802, 812 (3d Cir. 1984),
*cert. denied*, 477 U.S. 908, 106 S.Ct. 3284, 91 L.Ed.2d 572
(1986).  Under Fed.R.Civ.P. 59, the standard for granting a new
trial is if "the verdict is contrary to the great weight of the
evidence or errors at trial produce a result inconsistent with
substantial justice."  State Farm Mutual Automobile Insurance Co
v. Midtown Medical Center, Inc., Civ. A. No. 02-7389, 2007 U.S.
Dist. LEXIS 80549 at *8 (E.D. Pa. Oct. 31, 2007), quoting Sandrow
v. U.S., 832 F.Supp. 918 (E.D. Pa. 1993).  A new trial should
only be granted where a miscarriage of justice would result if
the verdict were to stand, if doing so is required to prevent
injustice or to correct a verdict that was against the weight of
the evidence, if there are prejudicial statements made by
counsel, or if the Court finds that substantial errors were made
in the admission or rejection of evidence or the giving or
refusal of instructions.  Id., quoting, *inter alia*, Olefins
Trading, Inc. v. Han Yang Chemical Corp., 9 F.3d 282, 289 (3d
Cir. 1993), Roebuck v. Drexel University, 852 F.2d 715, 736 (3d
Cir. 1988) and Ballarini v. Clark Equipment Co., 841 F.Supp. 662,
664 (E.D. Pa. 1993), *aff'd* 96 F.3d 1431 (3d Cir. 1996).  A new
trial cannot be granted, however, merely because the court would
have weighed the evidence differently and reached a different

verdict.  <u>Markovich v. Bell Helicopter Textron, Inc.</u>, 805 F.Supp.
1231, 1235 (E.D. Pa. 1992).

## **Discussion**

As noted, Plaintiffs brought suit under 42 U.S.C. §1983
alleging that the Springfield School District violated Section
504 of the Rehabilitation Act, the IDEA, the ADA and their
daughter's civil and due process rights under the Fourteenth
Amendment by, *inter alia*, unilaterally deciding to transport her
with high school age students and failing to properly train its
bus drivers thereby creating the danger with which she was
ultimately confronted.[2]  We address each claim *seriatim.*

A.   *Plaintiffs' §1983 Claims for Relief in Counts I-III*

---

[2]   On May 24, 2007, the U.S. Court of Appeals for the Third Circuit had
occasion to re-visit its earlier decision in <u>W.B. v. Matula</u>, 67 F.3d 484 (3d
Cir. 1995) that an action could be maintained against school officials under
§1983 for violations of the IDEA and §504 of the Rehabilitation Act.  On that
date the Third Circuit decided, in <u>A.W. v. Jersey City Public Schools</u>, 486
F.3d 791 (3d Cir. 2007), to abrogate those portions of <u>Matula</u> in which it held
that such actions could be maintained under §1983.  In so holding, the Court
reasoned, thanks to guidance provided by the Supreme Court's decision in <u>City
of Rancho Palos Verdes v. Abrams</u>, 544 U.S. 113, 125 S.Ct. 1453, 161 L.Ed.2d
316 (2005), that because the IDEA and §504 both create express, private means
of redress, a §1983 action is not available to remedy violations of the rights
created by those statutes.  <u>A.W.</u>, 486 F.3d at 802, 806.  <u>A.W.</u> is silent as to
the matter of its retroactive application and Defendants have not raised this
issue or challenged the verdict in this action on the basis of the <u>A.W.</u>
ruling.  For this reason, we find that the <u>A.W.</u> holding need not be applied in
this case and we do not address it further in this Memorandum. <u>See</u>, <u>Also</u>,
<u>Reynoldsville Casket Co. v. Hyde</u>, 514 U.S. 749, 115 S.Ct. 1745, 131 L.Ed.2d
820 (1995); <u>James B. Beam Distilling Co. v. Georgia</u>, 501 U.S. 529, 111 S.Ct.
2439, 115 L.Ed.2d 481 (1991)(both discussing circumstances governing
retroactive application of new rules of law announced in civil cases).

Plaintiffs further alleged that these actions also violated their own
parental liberty interest in their child and that the district unlawfully
retaliated against them for their constitutionally protected complaints and
reports after the incident occurred.  The jury, however, found no violation of
Mr. and Mrs. Enright's rights and the plaintiffs have not challenged the
jury's verdict.

Invoking Section 1983, the gravamen of Plaintiffs' Complaint in Counts I, II and III is that the defendant School District violated Cassia's rights to personal safety and security as guaranteed by the 14th Amendment by failing to properly train and supervise its bus drivers.

It is well-recognized that Section 1983 provides remedies for deprivations of rights established in the Constitution or federal laws; it does not, by its own terms, create substantive rights. Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006).[3]  To state a claim for relief under §1983, the plaintiff(s) must establish that they were deprived of a right, privilege or immunity secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law. American Manufacturers Mutual Insurance Co. v. Sullivan, 526 U.S. 40, 49-50, 119 S.Ct. 977, 985, 143 L.Ed.2d 130 (1999); Baker v. McCollan, 433 U.S. 137, 140, 99 S.Ct. 2689, 2692, 61 L.Ed.2d 433 (1979).

The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall deprive any person of life, liberty or

---

[3]  Specifically, Section 1983 provides in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person, within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in any action at law, suit in equity or other proper proceeding for redress...

property, without due process of law." To state a due process claim under §1983, a plaintiff "must identify a 'recognized liberty or property interest within the purview of the Fourteenth Amendment and show that they were intentionally or recklessly deprived of that interest, even temporarily, under color of state law.'" Anspach v. Philadelphia Department of Public Health, 503 F.3d 256, 262 (3d Cir. 2007), quoting Griffith v. Johnston, 899 F.2d 1427, 1435 (5th Cir. 1990), cert. denied, 498 U.S. 1040, 111 S.Ct. 712, 112 L.Ed.2d 701 (1991). The right to personal security has long been held to constitute a "historic liberty interest" protected substantively by the Due Process Clause. Youngberg v. Romeo, 457 U.S. 307, 315, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) citing Ingraham v. Wright, 430 U.S. 651, 673 (1977).

As a general rule, a municipal entity may not be sued under §1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by one whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under §1983. Monell v. Department of Social Services of the City of New York, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037-2038, 56 L.Ed.2d 611 (1978). Inadequacy of training may serve as the basis for §1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the municipal

employees at issue come into contact.  See, City of Canton v. Harris, 489 U.S. 378, 388, 109 S.Ct. 1197, 1204, 103 L.Ed.2d 412 (1989).  Indeed, the existence of a defective training program "necessarily intended to apply over time to multiple employees" makes proof of fault and causation at least possible if a program does not prevent constitutional violations.  Board of County Commissioners of Bryant County v. Brown, 520 U.S. 397, 407, 117 S.Ct. 1382, 1390, 137 L.Ed.2d 626 (1997), quoting City of Canton, 489 U.S. at 390, 109 S.Ct. at 1205.  Thus, continued adherence to an approach that the municipal entity knows or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action - the "deliberate indifference" - necessary to trigger municipal liability. Id.  In addition, the existence of a pattern of tortious conduct by inadequately trained employees may tend to show that the lack of proper training, rather than a one-time negligent administration of the program or factors peculiar to the employee involved in a particular incident is the "moving force" behind the plaintiff's injury.  Bryan County, 520 U.S. at 408, 111 S.Ct. at 1390, citing City of Canton, supra.  A claim for inadequate training will succeed if a plaintiff "can establish that the identified deficiency in the defendant's training program is closely related to the injury" suffered by the plaintiff.  Page v. School District of Philadelphia, 45

F.Supp.2d 457, 467 (E.D. Pa. 1999), quoting <u>Whichard v.</u>
<u>Cheltenham Township</u>, No. 05-3969, 1996 U.S. Dist. LEXIS 12660,
1996 WL 502281, *5 (E.D. Pa. 1996).

In reviewing the evidence produced at trial in the light
most favorable to the plaintiffs, we find there existed a more
than legally sufficient evidentiary basis on which the jury could
have found for the Enrights on the first three counts of their
complaint.  For one, as all of the school district's employees
testified, the only formal training which its bus drivers
received was the School Bus Driver Training Course administered
by the Pennsylvania Department of Transportation ("PennDot"), a
twenty-hour course consisting of 14 hours of classroom
instruction and 6 hours of vehicle familiarity and driving
instruction (in-bus training).  While they had a general
knowledge that some students required special educational
services, it is the Springfield School District's policy to give
its bus drivers no information about the various types of
disabilities and/or special needs of any of the children they are
transporting to and/from their respective alternative school
placements, ostensibly in the interests of maintaining privacy.
The bus drivers also are not given any specific directives to
separate the younger elementary school children from the older,
high-school age students on those buses on which it transports
them together.  With respect to the reporting of disciplinary

14

problems, the Springfield School District instructs its bus drivers only to use their discretion and best judgment in deciding whether to report unruly behavior to the applicable school principals for handling.

According to the trial testimony of Sandra Enright, prior to November, 2001 Cassia was transported to Woodlynde School in a van with one other little boy.  In November, 2001, Pat Schultz, Springfield's Assistant Transportation Director telephoned Mrs. Enright and told her that from that time forward, Cassia would be riding the same bus as her brother, Timothy and would be arriving home a little bit later.  Mrs. Enright testified that when she expressed concern, Ms. Schultz told her that she had no choice, that the decision was based on the district's decision to not send two vehicles to the same geographic area.  The plaintiffs were not advised that they could have appealed this determination and while they knew they could appeal an IEP, they did not know that they could appeal a transportation decision.  (N.T. 12/1/06, 173-175).  In the case of Bus 21, all of the high-school students being transported were males.  By the admissions at trial of J.W., T.P. and Timothy Enright, sexual banter and swearing were not unusual on their bus.  There was also evidence that despite the fact that J.W. had a history of having harassed and cursed out one of the substitute bus drivers earlier in the 2001-02 school year and of previously harassing a young Jewish girl on a

previous bus that he had ridden, he was never formally disciplined for these incidents nor was there any mechanism for imparting this information to subsequent drivers.

The jury also had the opportunity to view a videotape of part of Cassia's, T.P.'s and J.W.'s ride home on the day of the incident. Although the tape apparently ran out prior to the incident itself being recorded, it is clear from the tape that the substitute bus driver, Phil DiNardo, had the radio playing very loudly (Motown tunes) that day, that J.W. was, at various times throughout the ride, walking around on the bus, yelling insults out the window, throwing things at the bus driver, blowing a whistle and playing around with T.P. and that Cassia can be heard screaming at least once. J.W. can also be heard saying "Look, he was choking his chicken," to which the bus driver replied "Woo Hoo," and the bus driver is heard asking "What happened?" to which J.W. responded "He was playing with himself and then you hit the gas and he fell on himself." (N.T. 11/30/06, pp.162-167).

The plaintiffs produced the Pennsylvania School Bus Driver's Manual and the testimony of Dr. David Rostetter, an expert in special education and the application of public policy. Pursuant to the PennDot Manual, student-passengers should: (1) remain quiet enough to not distract the driver; (2) remain seated at all times while the bus is moving; (3) not extend arms or body parts

16

outside the bus; (4) not throw objects inside the bus or outside the windows; and "your school administration must prepare lists of rules and regulations covering student behavior and distribute them to students and parents..." (Exhibit D-5, p. B-4).  That page of the Manual further provides in relevant part:

> As a professional bus driver, you should always have a general knowledge of your passengers. Since you have contact with the students for only a short time each day, you will not know as much about the students as their teachers. However, you should learn the names and general behavior of each of your passengers.  You must not only know how to perform your job as a driver, but you must also know something of your riders' behavior patterns and a great deal about their reactions in order to safely pick up and deliver your passengers.  Your main function is to transport the students to their destination and discharge them safely.

Under the heading "Serious Discipline Problems," the Manual states further in pertinent part:

> Do not try to handle serious discipline cases yourself. Refer all such cases to your supervisor or the school principal.  Give all the facts and be sure the entire problem is clear.  Usually the child who causes problems on the bus is also causing problems in the classroom.  The school administrator has the whole picture of the child, while you, as a driver, know only about his or her bus behavior...

(Exhibit D-5, p. B-6).

In addition, the Manual also notes as some general "Guidelines for Managing Exceptional Students,"

> To manage exceptional students while transporting them, you must know their specific behavior patterns and required treatments.  All students are affected by other people's actions, particularly people who play significant roles in their lives, but exceptional students may be especially sensitive to the behavior and moods of others.

17

>Parents, teachers and special education professionals can give you information about the nature and extent of a student's handicap along with other relevant information...

(Exhibit D-5, p. D-4).

Dr. Rostetter, in turn opined that the incident of April 22, 2002 directly resulted from the defendant's policies and practices of, *inter alia*, (1) transporting elementary and secondary school age students together and not providing the bus drivers with any directives on separating them from one another, (2) not providing its bus drivers with information about the students it was transporting or their disabilities, (3) failing to provide its bus drivers with directives on how to or when to discipline students and to report all incidents of misbehavior on the buses and/or (4) creating and enforcing a code of discipline on its school buses.  (N.T. 11/30/06, pp. 192-225).  According to Dr. Rostetter, these deficiencies were in direct violation of the Pennsylvania School Code and of the special education transportation policies promulgated by the Delaware County Intermediate Unit.  Given all of this evidence and being mindful that it was up to the jury to resolve any issues regarding credibility, we find its finding of liability to be amply supported.  We therefore must decline to grant the defendant either judgment as a matter of law or a new trial as to the first three counts of the plaintiffs' complaint.

   B.    *Plaintiff's §1983 Claim in Count IV -*
          *State Created Danger*

Plaintiffs' alternatively argued that the School District knew or should have known that the adolescent male students with whom they were transporting Cassia would prey upon her given their history of emotionally disturbed and inappropriate behavior.  In so doing, the plaintiffs argue the defendants violated her 14th Amendment rights which violation is actionable pursuant to Section 1983 under the so-called "state-created danger" theory.

There is, of course, nothing in the language of the Due Process Clause itself which requires the State to protect the life, liberty, and property of its citizens against invasion by private actors.  DeShaney v.Winnebago County Department of Social Services, 489 U.S. 189, 195, 109 S.Ct. 998, 1003, 103 L.Ed.2d 249 (1989).  Rather, "[t]he Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security."  Id.  However, "it is true that in certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals." DeShaney, 489 U.S. at 198, 109 S.Ct. at 1004.  Thus,

> when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs - *e.g.*, food, clothing, shelter, medical care and reasonable safety - it transgresses the substantive limits on state action set by the Eighth

19

> Amendment and the Due Process Clause... (citations omitted).
> The affirmative duty to protect arises not from the State's
> knowledge of the individual's predicament or from its
> expressions of intent to help him, but from the limitation
> which it has imposed on his freedom to act on his own
> behalf.

DeShaney, 489 U.S. at 200, 109 S.Ct. at 1005-1006, citing Estelle
v. Gamble, 429 U.S. 97, 103, 97 S.Ct. 285, 290, 50 L.Ed.2d 251
(1976).

It is from this language that the state-created danger
doctrine has arisen as a "complement to the DeShaney holding."
Burella v. City of Philadelphia, 501 F.3d 134, 146 (3d Cir.
2007), quoting Bright v. Westmoreland County, 443 F.3d 276, 281
(3d Cir. 2006).  "The doctrine recognizes that a constitutional
violation may result 'when state authority is affirmatively
employed in a manner that injures a citizen or renders him more
vulnerable to injury from another source than he or she would
have been in the absence of state intervention.'" Burella, 501
F.3d at 146-147 quoting Bright, supra.

Ultimately, a state-created danger claim may be established
where the following four elements are established: (1) the harm
ultimately caused was foreseeable and fairly direct; (2) the
state actor acted in willful disregard for the safety of the
plaintiff or with a degree of culpability that shocks the
conscience; (3) there existed some relationship between the state
and the plaintiff such that the plaintiff was a foreseeable
victim of the defendant's acts, or a member of a discrete class

of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and (4) that the state actors affirmatively used their authority to create a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all. Bright, supra; Kneipp v. Tedder, 95 F.3d 1199, 1208-1209 (3d Cir. 1996).

While there had been some confusion regarding the application of the standard of culpability in such cases, the Third Circuit has stated that while "the state actor's behavior must always shock the conscience ... what is required to meet the conscience-shocking level will depend upon the circumstances of each case, particularly the extent to which deliberation is possible.  In some circumstances, deliberate indifference will be sufficient, [i]n others, it will not.  Sanford v. Stiles, 456 F.3d 298, 310 (3d Cir. 2006).  Thus, for example, "when a state actor is not confronted with a 'hyperpressurized environment' but nonetheless does not have the luxury of proceeding in a deliberate fashion, the relevant question is whether the [actor] consciously disregarded a great risk of harm.  Again, it is possible that actual knowledge of the risk may not be necessary where the risk is 'obvious.'" Id.

In application of the foregoing principles to our review of the evidence produced at the trial of this matter, we conclude

that the jury's verdict must likewise stand under the state-
created danger theory.  Again, the plaintiffs produced evidence
that it was the School District's unilateral decision to
transport Cassia with high-school age boys, one of whom it
clearly knew had a history of socially inappropriate and
sometimes violent behavior.  By so doing, the School District
could be found to have affirmatively used its authority in such a
manner that it rendered the child more vulnerable to danger than
had it not acted.  The plaintiffs also adduced evidence that it
was the School District's policy to not give its drivers any
information about the individual special education students whom
they were transporting or any information about the nature of
those students' disabilities and that the School District failed
to establish a code of discipline for its students or train its
drivers with respect to how to enforce discipline, leaving it
instead to the individual drivers' own best judgment and
discretion.  There further was no policy or practice of
separating younger, elementary age children from older children
in those circumstances where they were being transported together
or of directing the drivers to do so, nor was there any practice
established whereby the drivers were required to inform either
the School Administration or substitute bus drivers when a
student had misbehaved or acted inappropriately.  Given that
Cassia Enright was only seven years old with a social age of five

and that the nature of her disability was such that she has difficulty understanding and interpreting social cues and in view of J.W.'s history and oppositional defiant disorder, we find that the jury could reasonably have concluded that the harm which Cassia sustained as a result of this incident was foreseeable to the School District.  We additionally conclude that this evidence can sustain a jury finding that by deciding to place Cassia on that bus with the adolescent boys, the defendant was deliberately indifferent to both her safety and the risk of harm and that the harm inflicted was a direct result of the School District's actions.  Moreover, we believe that the evidence provided by the videotape would also amply support a finding by the jury that the actions of bus driver Philip DiNardo in particular reflected a conscious disregard of the plaintiff's safety and security.  So saying, we deny the defendant's motions for judgment as a matter of law and/or for a new trial with respect to her claims under the state-created danger theory.

### C.  *Claims for Monetary Damages Under the IDEA, ADA and Section 504 of the Rehabilitation Act*

In Count VII of their Complaint, the plaintiffs also sought monetary relief under the Individuals with Disabilities Education Act, 20 U.S.C. §1400, *et. seq.* ("IDEA"), the Americans with Disabilities Act, 42 U.S.C. §12101, *et. seq*. ("ADA") and Section 504 of the Rehabilitation Act, 29 U.S.C. §794 alleging that by unilaterally changing Cassia's transportation

arrangements without making it part of a new IEP and by not
providing her with an individual aide such as was provided to a
comparable disabled young male student, the School District
violated those Acts.

Congress enacted the IDEA to assist states in educating
disabled children.  Ridgewood Board of Education v. N.E. for
M.E., 172 F.3d 238, 247 (3d Cir. 1999).  In order to receive
funding under IDEA, a state must provide all disabled students
with a "free appropriate public education" ("FAPE") which must be
tailored to the unique needs of the disabled student through an
Individualized Education Plan ("IEP").  Id., citing Board of
Education v. Rowley, 458 U.S. 176, 181-182, 102 S.Ct. 3034, 73
L.Ed.2d 690 (1982).  The term "free appropriate public education"
is defined to mean "special education and related services" which
includes "transportation and such developmental, corrective, and
other supportive services ... as may be required to assist a
child with a disability to benefit from special education..."  20
U.S.C. §§1401(9), (26).  Under 20 U.S.C. §1415(b), written prior
notice to a child's parents must be given and an opportunity to
mediate or initiate a due process complaint must be given
whenever the local educational agency proposes to initiate a
change or change the provision of a free appropriate public
education to a child.  Pursuant to 20 U.S.C. §1414(d), a child's
IEP must be periodically reviewed at least annually, to determine

whether the child's annual goals are being achieved.

The Rehabilitation Act of 1973, 29 U.S.C. §701, *et. seq.* prohibits discrimination on the basis of disability in federally funded programs. Ridgewood, 172 F.3d at 253.  This prohibition against discrimination is specifically extended to public school systems in Section 504.  See, 29 U.S.C. §794(b)(2)(B).  As the Third Circuit summarized in Ridgewood:

> In order to establish a violation of §504 of the
> Rehabilitation Act, a plaintiff must prove that (1) he is
> "disabled" as defined by the Act; (2) he is "otherwise
> qualified" to participate in school activities; (3) the
> school or the board of education receives federal financial
> assistance; and (4) he was excluded from participation in,
> denied the benefits of, or subject to discrimination at, the
> school. W.B. v. Matula, 67 F.3d 484, 492 (3d Cir. 1995)
> (quoting Nathanson v. Medical College of Pennsylvania, 926
> F.2d 1368, 1380 (3d Cir. 1991).  In addition, the plaintiff
> must demonstrate that defendants knew or should be
> reasonably expected to know of his disability.  See id.  But
> a plaintiff need not prove that defendants' discrimination
> was intentional.  See id.  We have held that there are few
> differences, if any, between IDEA's affirmative duty and
> §504's negative prohibition and have noted that the
> regulations implementing §504 require that school districts
> "provide a free appropriate public education to each
> qualified handicapped person in its jurisdiction."  Id. at
> 492-93.

It has been said that an ADA claim is "the analogue" of a Section 504 claim in that "the ADA extends the nondiscrimination rule of Section 504 to services provided by any 'public entity' (without regard to whether the entity is a recipient of federal funds." Chambers v. School District of Philadelphia, Civ. A. No. 05-2535, 2007 U.S. Dist. LEXIS 88003 at *16-*17, n. 4 (E.D.Pa. Nov. 30, 2007), quoting Kevin M. v. Bristol Township School

District, 2002 U.S. Dist. LEXIS 22509, 2002 WL 73233 at *9 (E.D.
Pa. Jan. 16, 2002).  It is for this reason and because of the
link between §504 and Title II of the ADA that most courts treat
the two claims as analogous.  Chambers, at *17. See Also, Melissa
S. v. School District of Pittsburgh, 2006 U.S. App. LEXIS 14118,
183 Fed. Appx. 184 (3d Cir. June 8, 2006).

      In once again examining the trial record in this matter, we
find that the plaintiffs produced evidence that the School
District decided, without first consulting Cassia's parents or
entering into a new IEP, to change her transportation
arrangements and to begin transporting her on a bus with the
older students in an apparent effort to economize.  Mrs. Enright
further testified that she received no notice that she had the
right to appeal this decision and, while the School District has
likewise argued that the Enrights should have known of their
appeal rights by virtue of the length of time with which they had
been involved in the special education process and that they did
not protest this arrangement or specifically request a new IEP,
it was up to the jury to decide who and what to believe.   There
was further undisputed evidence that when a young, physically
handicapped student rode the bus at issue he was provided with an
aide and that after this incident, an aide was likewise provided
for Cassia.  In as much as we find that this evidence was
adequate to support the jury's finding of violations of the IDEA,

ADA and Section 504, we deny the defendant's post-trial motions on these claims as well.

For all of the reasons set forth above, we deny the defendant's renewed motion for judgment as a matter of law and for a new trial *in toto*.  An order follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

```
CASSIA ENRIGHT, a Minor and    : CIVIL ACTION
DONALD ENRIGHT and SANDRA       :
ENRIGHT, as Parents and         :
Guardians of CASSIA ENRIGHT    : NO. 04-CV-1653
and DONALD and SANDRA ENRIGHT :
in their own right              :
                                :
          vs.                   :
                                :
SPRINGFIELD SCHOOL DISTRICT     :
                                :
          vs.                   :
                                :
J.W. and T.P. a Minor in his   :
own right and by and through   :
his Parents and Guardians      :
J.P. and W.P.                   :
```

**ORDER**

_____AND NOW, this    27th    day of December, 2007, upon consideration of the Motion of Defendant Springfield School District for Directed Verdict/Judgment as a Matter of Law (Renewed) and for New Trial (Docket No. 96), it is hereby ORDERED that the Motion is DENIED for the reasons set forth in the preceding Memorandum Opinion.

                                    BY THE COURT:




                                    s/J. Curtis Joyner
                                    J. CURTIS JOYNER,        J.

28